[No. A028959. First Dist., Div. Five. May 12, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
RAYMOND MOORE et al., Defendants and Appellants.

[Opinion certified for partial publication.[1]]

[1] Pursuant to rules 976 and 976.1, California Rules of Court, this opinion is certified for publication, except for parts 2 through 27.

## COUNSEL

Frank O. Bell, Jr., and Harvey Zall, State Public Defenders, Michael Pescetta, Deputy State Public Defender, Eric L. Henrickson, and Merle L. Harding, under appointments by the Court of Appeal, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Mark S. Howell and Gerald A. Engler, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HANING, J.**—Defendants Raymond Moore, Kelvin White, and Jimmie Leon Holmes appeal their convictions for numerous theft and violent sex offenses. Specifically, defendants were each convicted by jury of four counts of oral copulation in concert (Pen. Code, § 288a, subd. (d)(1));[2] one count of attempted sodomy in concert (§ 286, subd. (d); 664); one count of rape in concert (§ 261, subd. (2); 264.1); one count of unlawful genital penetration with a foreign object in concert (§ 289; 264.1); two counts of assault with a firearm (§ 245, subd. (a)(2)); three counts of assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1)); two counts of false imprisonment (§ 236); two counts of robbery (former § 213.5); one count of unlawful taking of a motor vehicle (Veh. Code, § 10851); one count of mayhem (§ 203); and one count of first degree burglary (§ 459). The jury found each defendant personally used a firearm in the counts alleging that enhancement (Veh. Code, § 12022.5). Additionally, each defendant was found to be an ex-felon in possession of a firearm (Veh. Code, § 12021; 667). The court sentenced Moore to a term of 50 years in state prison, White to 38 years, and Holmes to 20 years. We affirm the judgment in all respects.

---

[2] Unless otherwise indicated, all further statutory references are to the Penal Code.

As the facts of these crimes are neither in dispute nor important to the issues raised in this appeal, a brief summary will suffice. At approximately 10:30 p.m. on the evening of June 11, 1983, Mr. and Mrs. I. arrived at home. They were confronted by three heavily armed individuals in their garage. The intruders forced the couple into the house, made them lie on their stomachs, and tied them together with neckties taken from a closet. Mrs. I. was forced to surrender her jewelry, and the home was ransacked and numerous items taken.

At one point, the intruders, who were Black, chanted in unison, "we are the Y.B.R.A.," and then discussed "about how they were here to save the world from White people and how much they hated them." Mrs. I., while still bound to her husband, was forced to orally copulate all three defendants. She testified that White held a gun to her head while she orally copulated him and that he threatened to "blow [her] brains out" if she put her teeth on his penis. While she was orally copulating one of the men, the other two laughed and urinated on the terrified victims. After Moore attempted unsuccessfully to sodomize her, he raped her. She was still tied to her husband during this act, her arm was twisted under her body, and she felt like her arm "was being pulled out of [the] socket." A brass door chime was forced into her vagina.

Afterward, Moore exposed her breasts and attempted to twist her nipples off, something he stated he'd "always wanted to do." Moore then jumped twice with all his weight on her abdomen. She was then hit on the head in quick succession with two wine bottles, a clay pot and a heavy glass jar. Moore also pushed her face into the broken glass. Both victims were struck in the face with the butt of a rifle with such force that one of Mr. I.'s ears was partially severed and Mrs. I.'s jaw was broken. The intruders left, taking the victims' automobile.[3]

After the police received an anonymous tip, a photographic line-up was conducted with six photographs. Mrs. I. immediately identified Moore's photograph. She viewed a second photographic lineup and selected two photographs—White and an individual named Bobby Thompson. Based on Mrs. I.'s identification, arrest warrants were obtained and all three suspects were arrested. Bobby Thompson was quickly cleared by police and released. White and Moore were arrested in the early morning hours at the apartment of Moore's girlfriend, Deanna Baldwin. Many articles taken from the victims' home were found in the apartment, as well as weapons matching the types carried by the three assailants. One of the rifles seized had a broken stock. Bloodstains on the stock were consistent with the blood types

---

[3] The car was recovered in three or four days, but it had been vandalized.

of the victims. When the arrests were made Moore's girlfriend, Baldwin, was wearing a ring taken from Mrs. I. Baldwin testified for the prosecution at trial under a grant of immunity that either Moore or White gave her the ring.

Baldwin also gave police information that led to Holmes. Holmes had shown her some credit cards bearing a name similar to the victims' and told her they had been taken from a woman he called "Miss Lady." He said he had "drank all of her wine and that she would not cooperate, so he took it." Later, in a tape-recorded conversation with police, Baldwin stated she had overheard Moore, White and Holmes talking about drinking "Miss Lady's" wine.[4] Furthermore, she told police that Holmes belonged to a militant revolutionary group called the Young Black Revolutionary Army, and he considered Charles Manson his idol. The phrases, "Charlie sent us" and "Helter Skelter," were written with a marking pen on the walls of the victims' residence, a reference to the infamous Charles Manson.

At a live lineup several days later Mrs. I. once again identified Moore and White. Although she was never able to identify Holmes, his fingerprints were found in the victims' residence. Mr. I. was never able to make an identification.

Neither Moore nor Holmes testified nor presented an affirmative defense. White presented an alibi, but the prosecution effectively impeached it.

Preliminarily, we note that each defendant has comprehensively briefed a multitude of issues on appeal. We have reordered and consolidated these issues when appropriate to aid organization and discussion.

## 1. ADEQUACY OF RECORD ON REVIEW

The main assignment of error is directed to the lack of a complete transcript of the trial proceedings. In response to appellate counsel's request during the briefing of this appeal, we ordered the record augmented to include the closing arguments of counsel.[5] The augmented transcript contains a certification by the court reporter that her stenographic notes for the date of June 28, 1984, were stolen from her automobile. The proceedings on that date include half of the closing argument of Moore's trial counsel, as well as the entire closing arguments of trial counsel for White and Holmes. All defendants contend that the loss of the court reporter's notes has denied

---

[4] The police found several partially empty wine bottles during their investigation of the crime scene.

[5] This is part of the normal record on appeal by the defendants. (Rule 33(a)(2)(e), Cal. Rules of Court.)

them the right to a constitutionally adequate record on appeal and requires reversal of their convictions.

■ Section 1181, subdivision 9, provides that a reviewing court "shall have [the] power" to order a new trial of an action "because of the loss or destruction, in whole or in substantial part" of the reporter's notes. This statute does not mandate a new trial in every case where reporters' notes are unavailable; rather, it merely authorizes the reviewing court to order a new trial if justice requires. The cases dealing with the issue indicate that as a predicate to reversal of a conviction due to the unavailability of a reporter's transcript, there must first be a showing of the impossibility of securing an adequate substitute for the missing transcript, and the presence of substantial issues showing the necessity for such. (See *People* v. *Curry* (1985) 165 Cal.App.3d 349, 354 [211 Cal.Rptr. 590]; *People* v. *Barnard* (1982) 138 Cal.App.3d 400, 408 [188 Cal.Rptr. 176].) The defects in the record must be of a prejudicial character, not merely inconsequential inaccuracies or omissions. *(People* v. *Chessman* (1950) 35 Cal.2d 455, 462 [218 P.2d 769, 19 A.L.R.2d 1084]; *People* v. *Morales* (1979) 88 Cal.App.3d 259, 267 [151 Cal.Rptr. 610].) Each case must stand on its own merits, and the outcome will depend upon the circumstances of the particular case.

■ At the outset, the Attorney General contends defendants should be precluded from complaining about the lack of an adequate record because of their lack of diligence in attempting to reconstruct defense counsels' closing arguments. Unquestionably "where other methods of reconstructing the trial record are available, the defendant must proceed with those alternatives in order to obtain review." *(People* v. *Jones* (1981) 125 Cal.App.3d 298, 300 [178 Cal.Rptr. 44]; *People* v. *Fuentes* (1955) 132 Cal.App.2d 484, 487-488 [282 P.2d 524].) A satisfactory record may at times be prepared through the use of notes taken during the trial by the attorneys and the trial judge; by the memories of attorneys, witnesses, and jurors; by agreement of the parties; and possibly from other sources. (See, e.g., *People* v. *Chessman, supra,* 35 Cal.2d at pp. 459-462; *People* v. *Hulderman* (1976) 64 Cal.App.3d 375, 381-382 [134 Cal.Rptr. 223]; *People* v. *Scott* (1972) 23 Cal.App.3d 80, 85-86 [100 Cal.Rptr. 34]; *People* v. *Fuentes, supra,* at p. 488.)

The Attorney General correctly observes that no effort appears to have been made by defendants in this case to complete the reporter's transcript by constructing a substitute for the missing closing arguments. However, we conclude that under the facts of this case, defendants' inaction should not preclude review. Appellate counsel were not involved in the case until their appointment to represent defendants on appeal. Unfortunately, due to the reporter's failure to advise the court or counsel, the discovery that these notes were missing did not come to light until a year after the trial, far from

a period of time when the arguments would be fresh in anyone's mind. We agree with the defendants that this lapse of time impedes meaningful reconstruction of the record of closing arguments.

■ When the record contains such massive omissions that the reviewing court cannot decide the defendant's challenges to his conviction, a new trial is in order. (See, e.g., *In re Ray O.* (1979) 97 Cal.App.3d 136, 138-139 [158 Cal.Rptr. 550] [no reporter's transcript of juvenile dispositional hearing]; *People* v. *Jones, supra,* 125 Cal.App.3d 298 [destruction of reporter's notes of entire trial]; *In re Steven B.* (1979) 25 Cal.3d 1 [157 Cal.Rptr. 510, 598 P.2d 480] [destruction of one day's notes of a two-day juvenile hearing].) "The test is whether in light of all the circumstances it appears that the lost portion is 'substantial' in that it affects the ability of the reviewing court to conduct a meaningful review and the ability of the defendant to properly perfect his appeal." (*People* v. *Morales, supra,* 88 Cal.App.3d at p. 267.)

■ Defendants claim the text of their counsels' closing arguments is necessary to support two contentions they might have addressed on appeal: (1) whether the prosecutor's allegedly improper rebuttal argument could be characterized as a "fair response" to defense counsels' arguments; and (2) ineffective assistance of defense counsel. The Attorney General has not attempted to justify any of the prosecutor's argument by characterizing it as a fair response to the defense arguments. The prosecutor's rebuttal argument does not contain any matter not covered in his opening argument or outside the record, and no objection thereto was interposed by any defendant. Therefore, a verbatim text of defense counsels' arguments is unnecessary to pass on defendants' first contention. This leaves only the assertion that the unavailability of a transcript of defense counsels' arguments precludes the potential assertion of a claim of ineffective assistance of counsel.

Reversals for ineffective assistance of counsel during closing argument rarely occur; when they do, it is due to an argument against the client which concedes guilt, withdraws a crucial defense, or relies on an illegal defense. (See *People* v. *Diggs* (1986) 177 Cal.App.3d 958, 970 [223 Cal.Rptr. 361].) The missing transcript herein represents a small proportion of over 4,000 pages of trial record. This record gives no indication that defendants received anything less than a vigorous, aggressive and extremely competent defense by experienced and well prepared attorneys. It is improbable that after rendering such exemplary assistance throughout this lengthy trial, all three defense counsel would suddenly argue against their clients during closing argument.

Furthermore, if defense counsel conceded an important issue or withdrew a critical defense during closing argument, it would most likely be empha-

sized for the jury during the prosecutor's rebuttal argument. Nothing of the kind appears here. The prosecutor's rebuttal argument was completely devoted to responding to the preceding arguments of defense counsel. It appears the arguments of the defense were fairly predictable—attacking Mrs. I.'s identification testimony, impugning Baldwin's motives for testifying, and beseeching the jury not to rush to convict because of the brutality of the crimes. It also appears that White's counsel aggressively argued his alibi defense. If any counsel made any remarks prejudicial to the other two defendants, we would expect to see motions for mistrial, or the issue raised in a subsequent new trial motion. The court's minutes for this period disclose that nothing other than the arguments occurred, and there are no new trial motions raising error in argument. In short, there is nothing in this record nor in the assertions of appellate counsel to indicate that the lost record contains anything of substance upon which a reversal of the judgment could be predicated.

We have considered *In re Andrew M.* (1977) 74 Cal.App.3d 295 [141 Cal.Rptr. 350], a case relied on by defendants in support of their assertion that the unavailable record makes meaningful review impossible and mandates a new trial. In that case the reporter failed to record counsel's arguments during a juvenile hearing and the judgment was reversed. Although the Attorney General attempts to distinguish *Andrew M.,* there is no reasoned way to do so. However, we are not persuaded by *Andrew M.* for several reasons. First, in other cases dealing with missing records there has been at least a prima facie showing that errors were committed during the unrecorded period sufficient to overcome the presumption of regularity in a trial. (See, e.g., *In re Steven B., surpa,* 25 Cal.3d at pp. 7-8 [appeal based on sufficiency of the evidence]; *People* v. *Jones, supra,* 125 Cal.App.3d at p. 300, fn. 5 [numerous assertions of error at trial]; *People* v. *Apalatequi* (1978) 82 Cal.App.3d 970, 973 [147 Cal.Rptr. 473] [defendant raised issue of prosecutorial misconduct].) Second, none of the authorities cited by *Andrew M.* support a rule of per se reversal for unavailability of a transcript of a portion of closing argument in the absence of any affirmative contention of error. *In re Andrew M.* was cited by the Supreme Court in *In re Steven B., supra,* 25 Cal.3d 1, but *Steven B.* involved missing *testimony* in an appeal alleging insufficiency of the evidence. Third, the subsequent decision of *Rose* v. *Clark* (1986) 478 U.S. 570 [92 L.Ed.2d 460; 106 S.Ct. 3101] leads us to conclude that the problem is subject to harmless error analysis. "[I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless error analysis." (478 U.S. at p. 579 [92 L.Ed.2d at p. 471; 106 S.Ct. at pp. 3106-3107].)

The record before us is complete in all other aspects; it contains all pretrial proceedings, the selection of the jury, the testimony of every wit-

ness, all the evidence, all motions, all rulings by the trial court, the instructions given to the jury, and the sentencing proceedings. The missing portion of the record contains only portions of the defense arguments, and there is no indication, nor assertion, that any malfeasance occurred therein. Under these circumstances, the loss of reporter's notes should not entitle defendants to a new trial. (See *People* v. *Morales, supra,* 88 Cal.App.3d at pp. 266-267 [loss of reporter's notes for portion of cross-examination of defendant did not require reversal where no prejudice shown].) We do not imply that the lack of a record of defense argument is harmless in all cases. We merely decline to adopt a rule of per se reversal, and conclude that the existent circumstances do not warrant reversal.

2.-27.*

. . . . . . . . . . . . . . . . . . . .

The judgments are affirmed.

Low, P. J., and King, J., concurred.

Petitions for a rehearing were denied June 10, 1988, and appellants' petitions for review by the Supreme Court were denied August 18, 1988.

---

* See footnote, *ante,* page 51.