Filed 1/27/16  P. v. Alvarez CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>DAVID RAYMOND ALVAREZ,<br><br>     Defendant and Respondent. | B259510<br><br>(Los Angeles County<br>Super. Ct. No. BA410600) |

APPEAL from an order of the Superior Court of Los Angeles County, Clifford L. Klein, Judge.  Affirmed and remanded with directions.

Janice Y. Fukai, Alternate Public Defender and Felicia Kahn Grant, Deputy Alternate Public Defender, for Defendant and Respondent.

Jackie Lacey, District Attorney, Phyllis C. Asayama, Roberta Schwartz and Leslie Meller, Deputy District Attorneys, for Plaintiff and Appellant.

——————————

The People appeal from the trial court's grant of defendant and respondent David Raymond Alvarez's new trial motion, which resulted in the reversal of his kidnapping conviction. For the reasons given below, we will affirm the trial court's granting of Alvarez's new trial motion and remand the matter to the trial court for further proceedings.

## BACKGROUND

Viewed in accordance with the usual rules of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Evidence of the alleged kidnapping.*

On April 25, 2013, around 3:30 a.m., Alyssa Alves was walking alone on the Lorena Street Bridge. Alves testified she had been walking for a few hours because "my boyfriend was gone and I wanted to . . . just get away from downtown." A van drove up to her and stopped. Defendant Alvarez got out, grabbed Alves, and pulled her into the van. Alves testified that a red blanket she had wrapped around her while she was walking fell into the street when Alvarez grabbed her.

Alves found herself in the back of the van, lying face down with Alvarez on top of her. Alvarez taped Alves's wrists behind her back. As he was doing this, he asked where she lived and she told him, "Downtown, San Pedro and 6th Street." Alvarez asked if she "wanted a ride," and Alves said yes "[b]ecause I was scared that he might hurt me." Alvarez offered her a cigarette, which she declined.

After Alvarez had driven the van for about ten minutes, a police car came up behind them and flashed its lights. Alvarez pulled over. When the van stopped moving, Alvarez gave her a tool and said " 'take the tape off your hands.' " When Alves wasn't able to cut the tape, Alvarez did it himself. At that point, the officers rescued Alves.

Alves acknowledged she did not have a very clear recollection of the incident because she had been "on a lot of medication for months and months." A year prior to the incident she had been hospitalized for depression. On the day that she testified, she had taken medication for anxiety and depression. Alves said she had not been on any medication or drugs the night of the incident, but she acknowledged having been

2

interviewed by a Detective Gonzalez that night, and her confusing testimony about this interview was arguably inconsistent with her denial of having been on medication:

"Q. Where did that [interview] take place?

"A. Oh, It – I went to jail. I was at – I – I don't know if it was Twin Towers. I don't know what it was called. I was still on medication.

"Q. Okay. What medication were you on?

"A. I don't remember.

"Q. So you were on medication when you were at Twin Towers, correct?

"A. Yeah.

"Q. Were you on medication when you were interviewed by the detectives?

"A. Yeah.

"Q. And when did that interview take place? Do you remember?

"A. No, I don't remember.

"Q. How long had you been in the jail before it took place?

"A. I wasn't in jail.

"Q. You said you were at the Twin Towers.

"A. Oh, the – which interview? Because there was two interviews.

"Q. Where was the first interview?

"A. I don't know. At a jail. They had picked me up. I was by 6th Street, and they picked me up.

"Q. Where did the second interview take place?

"A. I – wherever I was in jail the second time, Twin Towers, or wherever that was.

"Q. Do you have a clear recollection of all of the events that happened that night?

"A. No."

Alves testified she had not been worried about being arrested for using drugs on the night of the incident, and that one of the interviewing officers had assured her she was not in any trouble.

3

Alves denied that she had slept on the sidewalk or asked anyone for money that night. However, shown a transcript of her police interview, she acknowledged having said that she had done both things. Asked about the contradiction, Alves testified she did not know why she said that to the detective. Shown a photograph the police had taken of the van's interior, Alves acknowledged that she could see her red blanket on the back seat.

Los Angeles County Deputy Sheriff Fernando Galvan testified he was on patrol with his partner that night when, about two or three miles from the Lorena Street Bridge, they saw a white van stopped over the limit line at an intersection. Galvan made a U-turn, got behind the van and followed it, while activating his lights. As he drove, Galvan noticed a woman in the back of the van "sit up or kneel up and look in our direction." Then, after the woman "briefly looked in our direction, she started going towards the front of the van. And as she was doing that, I saw that both her hands were behind her back." The van slowed down briefly, accelerated, and then slowed down again before finally stopping.

When the officers approached the van, Alvarez was sitting in the driver's seat. The first thing Alves said to Galvan was, "This guy just kidnapped me." Galvan saw brown-colored tape on Alves's left wrist and on her sweater. Her left wrist "appeared to be fresh, raw, and irritated." Galvan saw a piece of the same kind of tape near the van's sliding door, and there was also a roll of tape inside the van.

2. *Trial court grants Alvarez's new trial motion.*

The trial in this case was very short. Alves's direct testimony covered no more than five pages in the reporter's transcript, followed by 16 pages of cross-examination, one page of redirect, and three pages of re-cross-examination. Galvan's entire testimony covered about 13 pages. The People's closing argument covered five and a half pages in the reporter's transcript, which was followed by defense counsel's closing argument of a little less than two pages. The jury convicted Alvarez of kidnapping (Pen. Code, § 207) after deliberating for about two hours, of which 30 minutes was taken up by a readback

4

of testimony. Alvarez admitted the charged prior prison term and prior serious felony conviction allegations (Pen. Code, §§ 667.5, 667, subds. (a)-(i)).

After the trial court appointed new defense counsel to handle post-verdict proceedings, Alvarez filed a new trial motion raising two ineffective assistance of counsel claims: (1) that defense counsel should have requested a jury instruction on false imprisonment as a lesser included offense; and (2) that defense counsel's closing argument had been inadequate.

The trial court denied Alvarez's ineffective assistance of counsel claim on the first ground (not asking for a false imprisonment instruction), and then addressed the second ground: "The problem I've always had literally . . . the minute defense counsel sat down it was such a short argument – and I can go through the various issues I anticipated a defense attorney would bring up. . . . Some contradictions on her signed statement by police, whether she had a red blanket. I don't know how important that is. Whether or not she was on medication; prior psychiatric issues; wandering around at 3 in the morning; burden of proof being beyond a reasonable doubt, instructions of credibility of witnesses. [¶] The problem I have is sometimes it can send a message to the jury. I don't think the short argument by itself is grounds for reversing the verdict and granting a new trial. Sometimes cases are so strong and dead-bang there is really nothing to argue in which case a two and 1/2 page argument would not indicate incompetency of counsel. [¶] I always thought it was a triable case. There is a reason why defense attorneys get to argue the case. That's part of the trial. If the defense attorney doesn't argue the case, then that seems to be a critical part of trial is missing and I thought it was the worst argument I've ever heard . . . ."

Urging the trial court to deny Alvarez's new trial motion, the prosecutor asserted defense counsel's closing argument had not been inadequate and, in any event, there was no resulting prejudice. The prosecutor argued Alves had been a sympathetic witness and "there is only so much, as far as credibility, that defense counsel could have attacked because of the strong corroborative evidence given by Deputy Galvan. [¶] [Alves] testified about being taped. When Deputy Galvan found her there was tape on one wrist.

5

She testified about . . . trying to cut that tape.  One wrist had tape and the other wrist had what [Galvan] described as a fresh, raw and irritated look.  [¶]  Based on the photographic exhibits admitted into evidence, there was a roll of tape in the back [of the van], there was a sharp object in the back.  All of these things added up to corroborate the victim's statements . . . ."  The prosecutor also noted the trial's brevity:  "This trial including voir dire, if I'm not mistaken, only lasted three days."

The trial court was not convinced:  "I never felt comfortable with [defense counsel's closing] argument the minute he stopped, and I just think there are too many points left out.  [¶]  I don't think Mr. Alvarez got a fair trial and that potentially could have affected the verdict.  Basically there was no argument.  It was not the kind of case that could be argued in a few minutes.  There are cases where defense counsel does make that correct tactical decision, but in this case I didn't think it was that way.  [¶]  So I've never actually granted this motion before but I'm going to do it.  Grant the motion for new trial based upon incompetency of counsel."

## CONTENTION

The People contend the trial court erred by finding defense counsel failed to provide effective assistance during closing argument.

## DISCUSSION

1. *Defense counsel's closing argument.*

During the People's portion of closing argument, the prosecutor emphasized that Deputy Galvan's testimony had corroborated the core details of Alves's testimony, and argued that the evidence as a whole amply made out all the elements of kidnapping.

When defense counsel's turn came, he initially attacked the officer's credibility, saying Galvan "testified that he saw through the back window of this van . . . in which the window was tinted.  He saw this woman with their [*sic*] hands behind their back.  And I suggest to you that this part of this officer's testimony is blatantly false.  There is no way that officer saw that through that window.  [¶]  Why did he do that?  He did that because he realized he had a squirrely witness who had some problems with remembering what was going on, and so he was going to make sure that when this came

6

to the court, that there was tape around this woman's arms, and he saw it. He didn't see it. He did see what he took a picture of, but nothing more. . . . [¶] Now, this is a picture of the van with the tinted window . . . and think about it. Here he has got his lights shining from his police car behind him, and they're going to reflect off of that window. And there is no way he is going to be able to see inside that van from behind the van."

Defense counsel then switched his focus to Alves: "The first thing she said when they got out of the car with the police officers was, 'He kidnapped me.' She told you she was afraid she was going to be arrested, and that's my point. That's why she told the police that she had been kidnapped, because she didn't want to go to jail. . . . [¶] Now, talking about roll of tape that's in the car, that does not appear to be the same kind of tape . . . that was around her wrist, and that's another thing that . . . you can consider. This woman got into that van voluntarily. She was going to be taken home. They got stopped by the police. She was afraid she was going to get arrested, and then . . . we've got this story about being kidnapped. [¶] You saw her demeanor. You saw her, and then you listened to what she had to say about her memory and how she wasn't afraid. She told the police officer that was interviewing her that she wasn't afraid. [¶] Is this the kind of testimony you want to use to convict somebody? I say no."

2. *Legal principles.*

"We explained in *Strickland* [*v. Washington* (1984) 466 U.S. 668 [104 S.Ct. 2052] (*Strickland*)] that a violation of [the Sixth Amendment right to effective assistance of counsel] has two components: [¶] 'First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' [Citation.] [¶] To establish ineffectiveness, a 'defendant must show that counsel's representation fell below an objective standard of reasonableness.' [Citation.] To establish prejudice he 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the

7

result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*Williams v. Taylor* (2000) 529 U.S. 362, 390-391 [120 S.Ct. 1495].)

"In determining whether counsel's performance was deficient, a court must in general exercise deferential scrutiny" in order to avoid "the adverse consequences that systematic 'second-guessing' might have on the quality of legal representation provided to criminal defendants and on the functioning of the criminal justice system itself." (*People v. Ledesma* (1987) 43 Cal.3d 171, 216.) "We cautioned in *Strickland* that a court must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight. [Citation.]" (*Bell v. Cone* (2002) 535 U.S. 685, 702 [122 S.Ct. 1843].)

"The right to effective assistance extends to closing arguments. [Citations.] Nonetheless, counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. Closing arguments should 'sharpen and clarify the issues for resolution by the trier of fact,' [citation], but which issues to sharpen and how best to clarify them are questions with many reasonable answers. Indeed, it might sometimes make sense to forgo closing argument altogether. [Citation.] Judicial review of a defense attorney's summation is therefore highly deferential . . . ." (*Yarborough v. Gentry* (2003) 540 U.S. 1, 5-6 [124 S.Ct. 1].) "Reversals for ineffective assistance of counsel during closing argument rarely occur; when they do, it is due to an argument against the client which concedes guilt, withdraws a crucial defense, or relies on an illegal defense. [Citation.]" (*People v. Moore* (1988) 201 Cal.App.3d 51, 57.) "The mere circumstance that a different, or better, argument could have been made is not a sufficient basis for finding deficient performance by defense counsel. [Citations.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 748.)

"A trial court has broad discretion in ruling on a motion for a new trial, and there is a strong presumption that it properly exercised that discretion. ' "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." ' [Citation.]" (*People v. Davis* (1995) 10 Cal.4th 463, 524.)

In the context of a Sixth Amendment ineffective assistance of counsel claim, this means a reviewing court must measure both the deficient representation prong and the prejudice prong by the same abuse of discretion test. "An order granting a new trial for ineffective representation of counsel is subject to an abuse of discretion standard of review. Not only is the trial court's determination of prejudice subject to this standard, but also its determination whether counsel's representation was deficient. A party seeking to overturn the trial court's decision has the burden to demonstrate that the decision was irrational or arbitrary, or that it was not grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue. (*People v. Callahan* (2004) 124 C.A.4th 198, 209 . . . ." (5 Witkin, Cal. Criminal Law (4th ed. 2012) Criminal Trial, § 268, p. 448.)[1]

3. *Discussion*.

As the foregoing discussion of the governing standards of review demonstrates, there are in this case two countervailing principles of deference. On the one hand, deference must be paid to the tactical choices a defense attorney makes during the course of a criminal trial, particularly with respect to the sort of closing argument defense

---

[1] "While the People correctly note we must independently review trial court determinations whether a defendant was prejudiced by juror misconduct in the context of a new trial motion that is *denied* [citation], our Supreme Court recently clarified that orders *granting* a new trial on a finding of prejudicial juror misconduct are reviewed for an abuse of discretion [citation]. Although the court . . . did not expressly extend this rule to all orders granting a new trial, we discern no reason, and the People offer none, why the same standard of review should not apply to other findings of prejudice that are adjudicated in granting a new trial. [Citation.]" (*People v. Callahan*, *supra*, 124 Cal.App.4th at p. 209.)

counsel chooses to make. On the other hand, deference must also be paid to a trial court's determination that a defendant has suffered ineffective assistance of counsel requiring the trial court to grant a new trial motion.

In this case, we believe this clash of principles is best resolved by respecting the fact that it was the trial judge who saw the witnesses in the flesh and heard their testimony in a live setting. As the Court of Appeal in *People v. Andrade* (2000) 79 Cal.App.4th 651, 660, explained: "As a court that reviews the conduct of counsel in hindsight, we are reluctant to second-guess tactical decisions made by trial counsel. [Citations.] We are equally, if not more reluctant, to second-guess the trial court's discretionary ruling that defense counsel's tactical decisions made before it resulted in an unfair trial, i.e., a miscarriage of justice. In this respect, an ineffective assistance claim made in a motion for new trial differs from one raised for the first time on appeal or petition for writ of habeas corpus. 'After all, the trial court is in the best position to make an initial determination, and intelligently evaluate whether counsel's acts or omissions were those of a reasonably competent attorney.' [Citation.]"

At first glance, the closing argument made by Alvarez's attorney may not seem inadequate. Our Supreme Court has consistently refused to find ineffective assistance of counsel predicated on a claim that a closing argument was too short to be competent,[2] and the United States Supreme Court has acknowledged that "it might sometimes make sense to forgo closing argument altogether." (*Yarborough v. Gentry*, *supra*, 540 U.S. at p. 6.) Here, however, the trial court was clear that the problem it saw was not merely the

---

[2]     See, e.g., *People v. Dickey* (2005) 35 Cal.4th 884, 927 [three-page long closing argument during penalty phase in capital case "did not fall below the standard of reasonably competent representation, and we find no reasonable probability that a different argument would have convinced the jury to vote for life over death"]; *People v. Lewis* (2001) 25 Cal.4th 610, 675 [two-page long penalty phase closing argument at capital trial did not constitute "inadequate representation" because " 'the length of an argument is not a sound measure of its quality' "]; *People v. Mayfield* (1993) 5 Cal.4th 142, 186 ["If defendant is asserting . . . closing argument was inadequate in principle because briefly made, we cannot agree: brevity and eloquence are not necessarily inconsistent."].

brevity of the closing argument, but the fact that counsel's argument had so completely failed to address important issues that it wound up being "the worst [closing] argument" the court had ever heard.

As to the competency prong of the *Strickland* ineffective assistance of counsel test, it could be argued that some of the issues the trial court wanted defense counsel to address would not have been all that fruitful. Whether Alves's red blanket had been lost on the street, or instead had been carried into the van, seems an unimportant minor detail. Similarly, Alves's inability to explain why she inaccurately told a detective about sleeping on the street and soliciting money that night had no direct connection to her kidnapping allegation. However, highlighting this evidence, as well as evidence of her mental health history and possible use of psychiatric drugs, could have impeached Alves's general credibility, which would have assisted the defense claim that her story was not to be believed. As the District Attorney acknowledges, "Based on her testimony, it was unclear whether [Alves] was using drugs or medication at the time of the incident." Certainly emphasizing the jury's obligation to find Alvarez guilty beyond a reasonable doubt would have generally highlighted Alves's credibility problems.

As for the prejudice prong of the *Strickland* test, Alvarez points out there was a blatant factual inaccuracy at the core of the closing argument because defense counsel incorrectly asserted that Alves had testified "she was afraid she was going to be arrested." Defense counsel relied on this assertion as the basis for his primary claim that Alves invented the kidnapping story because she was afraid of being arrested for using drugs. In fact, however, Alves expressly testified that she was *not* afraid of being arrested. Indeed, she testified that one of the police officers had assured her she was not in any trouble.

And there was a second inaccuracy. In trying to discredit Deputy Galvan's testimony, defense counsel asserted that Galvan "was going to make sure that when this came to court, that there was tape around [Alves's] arms, and he saw it. He didn't see it. He did see what he took a picture of, nothing more. . . ." But Galvan never testified he

11

*saw* Alves's arms taped; he testified only that while driving behind the van he saw her stand up and go towards the front of the van with her hands behind her back.

While one might be tempted to conclude that, regardless of the omissions and misstatements in defense counsel's closing argument, the strength of the circumstantial evidence would have led any reasonable juror to conclude a kidnapping did occur, we are mindful of the fact that it was the trial judge – not this court – who saw the witnesses testify. And in this regard we again cite *People v. Andrade*, *supra*, 79 Cal.App.4th at p. 661: "In theory and in practice, there comes a time when a tactical decision is so unreasonable that the trial court is compelled to intervene. The trial court found that this was such a case. Yet, dismissing the finding as arbitrary, the People seek to force the trial court to sentence the defendant, despite its belief that the result was unfair. We cannot grant this request. '[C]riminal defendants, regardless of their guilt or innocence, are entitled to a fair trial . . . ,' and the trial court is obligated to grant a new trial if it finds the result of the first trial to have been unfair. [Citation.] [¶] A trial court serves as a 'gatekeeper' on a motion for new trial. It opens the gate only rarely, a testament to the fact that the vast majority of trials resulting in conviction are fairly conducted. In these cases, motions for new trial are routinely made, routinely denied, and are routinely affirmed on appeal. In the remaining cases, however, the trial court grants the motion, and we affirm those rulings in the absence of a clear showing of abuse of discretion. [Citation.]"

We conclude the trial court here did not abuse its discretion by granting Alvarez a new trial.

## DISPOSITION

The order granting Alvarez's motion for new trial is affirmed.  The matter is remanded to the trial court for further proceedings.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

ALDRICH, J.

JONES, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

13