Filed 3/18/22  P. v. Cordero CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F081748 |
| Plaintiff and Respondent, | (Super. Ct. No. F20901791) |
| v. | |
| EDDIE SERNA CORDERO, | **OPINION** |
| Defendant and Appellant. | |

<u>**THE COURT**</u>[*]

APPEAL from a judgment of the Superior Court of Fresno County.  F. Brian Alvarez, Judge.

Kathleen Sherman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill, Melissa Lipon and Jeffrey D. Firestone, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]  Before Hill, P. J., Snauffer, J. and DeSantos, J.

Defendant Eddie Serna Cordero stands convicted of possession of a firearm and ammunition as a felon, misdemeanor obstructing an officer, and misdemeanor reckless driving. On appeal, he contends (1) the evidence was insufficient to support the convictions because his identity as the perpetrator of the offenses was not credibly established, and (2) defendant's trial counsel was ineffective for failing to emphasize the best evidence tending to show that defendant was not the perpetrator. The People disagree on both accounts.

We ordered the parties to submit supplemental briefing on the question of whether any remaining balance on the probation report fees imposed pursuant to former Penal Code section 1203.1b[1] should be vacated because they are uncollectable and unenforceable pursuant to Assembly Bill No. 1869 (2019–2020 Reg. Sess.) (Assembly Bill 1896). The parties agree that we should order any remaining balance on the probation report fees vacated. We vacate the portion of the judgment imposing probation report fees. As modified, we affirm.

## PROCEDURAL SUMMARY

On August 11, 2020,[2] the Fresno County District Attorney filed a first amended information charging defendant with possession of a firearm by a felon (§ 29800, subd. (a)(1); count 1), possession of ammunition by a felon (§ 30305, subd. (a)(1); count 2), misdemeanor resisting, delaying, or obstructing an officer (§ 148, subd. (a)(1); count 3), and misdemeanor reckless driving (Veh. Code, § 23103, subd. (a); count 4). As to counts 1 and 2, the amended information further alleged that defendant had suffered eight prior felony convictions.

On August 18, the jury found defendant guilty on all counts.

---

[1]     All further statutory references are to the Penal Code unless otherwise stated.

[2]     All further dates refer to the year 2020 unless otherwise stated.

On September 16, the trial court sentenced defendant to three years in prison as follows:  on count 1, three years (the upper term); on count 2, three years (the upper term) stayed pursuant to section 654; and on counts 3 and 4, 180 days concurrent with the term on count 1.  The court also imposed a $296 probation report preparation fee pursuant to former section 1203.1b.

On September 17, defendant filed a notice of appeal.

## FACTUAL SUMMARY

On February 12, at approximately 1:30 a.m., Fresno County Sheriff's Deputy Tyler Phillips was on patrol duty in a marked patrol car.  He was parked on the side of a street in the Old Fig Garden area of Fresno, watching traffic pass through an intersection.  As he watched, a gray 2000 four-door sports sedan (the gray car) drove through the intersection at a speed that he believed to exceed the marked speed limit of 30 miles per hour.  Phillips began to follow the gray car.  At the next intersection, the gray car approached a solid red stoplight and a vehicle stopped at the stoplight.  It drove onto the dirt shoulder of the road and made a right turn, striking its front fender on a curb and illegally passing the vehicle stopped at the intersection.[3]

Phillips continued to follow the gray car without activating his patrol lights.  He intended to get close enough to the vehicle to read and run its license plate before he initiated a stop.  He explained that the information obtained from running a license plate impacts "the way in which … [he] would stop [a] vehicle.  [For instance,] [i]f someone was wanted … for murder, [Phillips] would[ not] walk up … [to] their driver's side [door] and start taking to them."  After the gray car had driven about half of a mile, it turned off its headlights and taillights.  The gray car then accelerated to about 80 miles

---

[3]     Phillips was about eight car lengths or approximately 120 feet behind the gray car when it turned the corner.

per hour on a section of the street with a speed limit of 35 miles per hour and continued in the same direction.

The gray car made a left turn before the next major intersection and continued to drive without its lights on. The gray car proceeded through an intersection with a stop sign without stopping before eventually coming to a stop in front of a residence.[4] Phillips parked his patrol vehicle "about one car length[ or about] 15 feet behind [the gray car] and … activated [his] emergency lights and … spotlights." Phillips also read the vehicle's license plate number and broadcasted it over his radio.

Defendant then exited the front driver seat of the gray car and looked at Phillips "for about three seconds" as Phillips exited the driver seat of his patrol car. Defendant was "very clearly illuminated" by the streetlights in the neighborhood and the "extremely bright" LED spotlights on Phillips's patrol car. Phillips had no trouble seeing defendant. He was wearing a baggy, black hooded pullover sweatshirt with distinct white markings, baggy, dark blue jeans, and black and white shoes. Phillips recognized defendant— although he did not immediately remember his name—because, about three months earlier, on November 11, 2019, he had a "law enforcement contact with [defendant] within the scope of [his] employment." That prior contact lasted "for about three hours" and Phillips came "[w]ithin less than one foot" of defendant. Phillips testified he was "extremely confident" and "100 percent positive" in his identification of defendant. In part, Phillips was so certain because he recognized a tattoo across defendant's right jawline and a tattoo of a paw print under his left eye.[5] The tattoo on defendant's jawline read "Miranda" in small, neat script. On the date of the trial, the tattoo was different; it read "Melissa" in larger, cursive script and appeared to Phillips to be more recent and to

---

[4]    Phillips testified that he was about eight car lengths or approximately 120 feet behind the gray car when it drove through the intersection without stopping.

[5]    Phillips did not record his identification of defendant by his tattoo in his report.

4.

be covering the previous tattoo. Phillips approached defendant at trial and, from a distance of three feet, was able to see the "Miranda" tattoo underneath the "larger newer tattoo."[6] Phillips also described that defendant looked different at trial than he did on February 12 in other ways—defendant had gained approximately 40 pounds and had grown out some of the hair on his head.

On February 12, when defendant exited the gray car, Phillips shouted, " 'Sheriff's Office, stop.' " Defendant ran between the gray car and the patrol car, toward the residence in front of which he had parked.[7] Phillips noticed that defendant had his left hand near his waistband as he ran, ignoring Phillips's command to stop. Defendant's hand was "fixed as if he was holding something." Defendant then jumped over a fence and Phillips lost sight of him.

Phillips then directed his attention to two women exiting the gray car. Phillips spoke to the two women and learned that defendant had met them or picked them up from a specific gas station and market approximately 2.3 miles from the location where Phillips had stopped the vehicle. Phillips obtained consent to search one of the two women and found a glass methamphetamine pipe on her person. Phillips then searched the gray car and found on the front driver's seat an empty, black nylon drop thigh holster for a small or subcompact handgun.

Phillips, with the assistance of other officers, searched the backyard that defendant fled through. In the dirt, approximately one foot from the fence where Phillips lost sight of defendant, Phillips found half of a wooden grip for a revolver. On the grass,

---

**6**    A right side profile photograph of defendant was taken at trial and admitted as People's Exhibit 10.

**7**    At that point, Phillips testified that defendant was "a little less than 15 feet" from defendant as he ran between the two cars and Phillips stood behind the open front driver door of his patrol car. On cross-examination, Phillips testified that he was between 15 and 20 feet from defendant when he ran between the cars.

approximately five feet from the first piece of the grip, Phillips found the second piece of the grip. Then, on the grass, approximately 20 feet from the fence, Phillips found a ".38 special revolver" loaded with six unfired rounds. The revolver did not have a grip attached. The two pieces of grip that Phillips recovered appeared to fit on the revolver and the revolver fit in the holster found in the gray car. Phillips noted that the two pieces of grip and the revolver all appeared to be recently discarded; all were clean of dirt, grass, and debris, and none had signs of condensation despite the early morning hour. Phillips also noted that the serial number on the revolver had been partially ground off.

Phillips did not locate defendant on February 12.

At approximately 8:00 a.m. on the same date, Phillips went to the gas station and market at which the defendant had stopped earlier that morning. Phillips obtained a security camera video from the gas station and market. The video depicted defendant and the two women who were in the gray car with defendant when Phillips made the stop. The video was played for the jury.[8]

On March 9, Phillips learned that defendant was arrested on an unrelated matter.[9] He made contact with defendant on the same day.

**The Defense Case**

Defendant testified that he had been previously convicted of felony offenses.

In November 2019, defendant was booked into custody on an unrelated matter. On that date, jail booking staff took photographs of him from the front and from the sides.

On February 12, defendant did not drive the gray car and was not at the gas station and market. He did not possess a firearm on that date. Defendant did not know the two women who were in the gray car when Phillips made the stop. Defendant did not

---

[8]     The video was admitted as People's Exhibit 8.

[9]     A front-view booking photo of defendant was admitted as Defense Exhibit A.

6.

remember what he was doing on February 12. Defendant had never had a tattoo on his face that read "Miranda." He did have a tattoo on his neck that said "Miranda." He displayed that tattoo for the jury. Defendant got the tattoo on his face that read "Melissa" after he was booked into custody on March 9.

On March 11, defendant spoke to Phillips. Phillips did not mention the firearm and ammunition charges. Phillips asked defendant if he remembered Phillips and asked if defendant drove the gray car. Defendant said he did not remember Phillips and he did not drive the gray car. However, defendant did not learn about the charges relating to the February 12 incident until approximately March 12 when he was in custody on an unrelated matter.

Defendant testified that he had gained "a little" weight since he was booked into custody. However, defendant testified that his hair had not changed since he was booked into custody.

Private investigator Jeff Gunn testified that he was previously a detective with the Fresno Police Department. In 1988, when he last worked for the Fresno Police Department, the common practice when booking a suspect was to photograph the front, both sides, and sometimes the rear of the suspect. Modernly, only a photograph depicting the front view of a suspect is obtained. On the morning he testified, he attempted to obtain booking photos of defendant that depicted front, side, and rear profile views. Gunn contacted the Fresno County Sheriff's Department and was informed that his request for photographs would take 10 days to process. He did not obtain photographs from the sheriff's department. He did obtain a color photograph from the Fresno Police Department from March 8.

**The People's Rebuttal Case**

Phillips spoke to defendant while he was in custody on March 9. Phillips told defendant that he would be adding charges related to firearms possession. Defendant seemed shocked and said, " 'You got the wrong guy.' "

7.

Phillips testified that the Fresno County jail does not take side profile pictures during booking.

Phillips reiterated that he remained confident in his identification of defendant. He recognized defendant's jawline tattoo and his face.

## DISCUSSION

### 1.  Sufficiency of the Evidence

Defendant contends the evidence was insufficient to prove his identity as the driver of the gray car.  Defendant contends that Phillips's identification of defendant was unreliable for two reasons:  first, neither the security camera video from February 12, nor the booking photo taken on or about March 8, depict a tattoo on defendant's right jawline that Phillips testified that he observed on February 12; second, the receding hairline of the man in the February 12 security camera video was different from defendant's hairline as depicted in the March 8 booking photograph.  The People respond the prosecution presented substantial evidence in support of the verdict and defendant's argument improperly asks this court to reweigh the evidence and reevaluate the credibility of Phillips's testimony.  We agree with the People.  Substantial evidence supported the verdict.

#### A.  Standard of Review

" 'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves.  Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.]  We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]  …  We do not reweigh evidence or reevaluate a witness's credibility.' [Citations.]  'Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.]  Moreover, unless the testimony is physically

8.

impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.' " (*People v. Brown* (2014) 59 Cal.4th 86, 105–106; *People v. Friend* (2009) 47 Cal.4th 1, 41 [conflicts in the evidence are for the jury to resolve, and where a jury has credited statements by a witness, an appellate court can reject those statements only if they are physically impossible or facially false].)

"Where, as here, the jury's findings rest to some degree upon circumstantial evidence, we must decide whether the circumstances reasonably justify those findings, 'but our opinion that the circumstances also might reasonably be reconciled with a contrary finding' does not render the evidence insubstantial." (*People v. Earp* (1999) 20 Cal.4th 826, 887–888.) Further, if the record contains substantial evidence from which a reasonable trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt "the possibility that the trier of fact might reasonably have reached a different conclusion does not warrant reversal." (*People v. Taylor* (2004) 119 Cal.App.4th 628, 639.)

### B. Analysis

Defendant does not challenge the sufficiency of the evidence to meet any element of any of the offenses of conviction other than his identity as the perpetrator. "Identification of the defendant by a single eyewitness may be sufficient to prove the defendant's identity as the perpetrator of a crime." (*People v. Boyer* (2006) 38 Cal.4th 412, 480.) If, considered in the light most favorable to the verdict, the security camera video and booking photograph do not render Phillips's testimony physically impossible or inherently impossible, we must affirm.

Defendant first argues that a jawline tattoo was not visible in the security camera video or the booking photograph therefore Phillips's testimony that he recognized defendant by that tattoo was unreliable. We disagree. Phillips testified that he recognized defendant at the scene of the stop, in part, because of the tattoo of the word "Miranda" on defendant's jawline. In the booking photograph, a line appears on

9.

defendant's jawline. The line could be facial hair growth or a tattoo. Moreover, at trial, Phillips viewed defendant from a distance of three feet and testified that he could still see the tattoo reading "Miranda" under the newer, darker tattoo that read "Melissa." We viewed the courtroom photograph of defendant's jawline. An older tattoo is visible under the "Melissa" tattoo. Phillips's testimony that he recognized defendant by a "Miranda" tattoo on his jawline was not physically impossible or inherently improbable.

Second, defendant contends that the security camera video depicts a man with a receding hairline that could not have been him. He therefore contends Phillips's testimony should have been rejected. We disagree. The surveillance video, which we have viewed, depicts a male driver and two female passengers arriving at the convenience store and market in a sedan consistent with Phillips's description of the gray car.[10] The driver's attire is consistent with Phillips's description of defendant at the scene of the stop—wearing a black pullover hooded sweatshirt with white details, dark blue jeans, and black and white shoes. The driver appears to have close cropped hair, but his hairline is difficult to distinguish as a result of the visual distortions in the video. In the light most favorable to the verdict, we cannot conclude that defendant, as depicted in the booking photo, is certainly not the person depicted in the security camera video. Phillips's testimony on that issue was not physically impossible or inherently improbable.

Sufficient evidence supported the verdict.

---

**10**    Defendant contends that the sedan depicted in the video is blue. He suggests that because Phillips described the vehicle as gray that "it is simply not credible that [he] was able to make accurate observations" at the site of the stop. As a threshold matter, the sedan depicted in the security camera video could fairly be described as gray. Further, the jury heard Phillips's testimony and viewed the security camera video—the credibility of his identification of defendant was squarely before the jury and we do not reassess the jury's determination. Phillips's description of the color of the gray car, even if inaccurate, does not render the remainder of his testimony impossible or inherently improbable.

## 2. Ineffective Assistance of Counsel

Defendant argues that his convictions must be reversed because his trial counsel introduced, but was ineffective for failing to emphasize, the most important evidence regarding the identity of the suspect. Specifically, defendant's trial counsel failed to emphasize that the hairline of the man in the security camera video was different than defendant's hairline on the date of his arrest. The People respond that trial counsel made reasonable tactical decisions and, in any event, defendant suffered no prejudice. We agree with the People that defendant's trial counsel's performance was not deficient and, in any event, defendant suffered no prejudice.

### A. Additional Background

In his closing argument, defendant's trial counsel argued that defendant was not the person depicted in the security camera video. However, his emphasis was on defendant's face, not his hairline.

### B. Standard of Review

To prevail on a claim of ineffective assistance of counsel, the defendant must prove (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced his defense. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–694; *People v. Ledesma* (1987) 43 Cal.3d 171, 216–218.) "The right to effective assistance extends to closing arguments. [Citations.] Nonetheless, counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. Closing arguments should 'sharpen and clarify the issues for resolution by the trier of fact,' [citation], but which issues to sharpen and how best to clarify them are questions with many reasonable answers. Indeed, it might sometimes make sense to forgo closing argument altogether. [Citation.] Judicial review of a defense attorney's summation is therefore highly deferential .…" (*Yarborough v. Gentry* (2003) 540 U.S. 1, 5–6.) "Reversals for ineffective assistance of counsel during closing

11.

argument rarely occur; when they do, it is due to an argument against the client which concedes guilt, withdraws a crucial defense, or relies on an illegal defense." (*People v. Moore* (1988) 201 Cal.App.3d 51, 57.) "The mere circumstance that a different, or better, argument could have been made is not a sufficient basis for finding deficient performance by defense counsel." (*People v. Ledesma* (2006) 39 Cal.4th 641, 748.)

To establish prejudice, defendant must show that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. (See *Strickland v. Washington*, *supra*, 466 U.S. 668, 693–694; *In re Cordero* (1988) 46 Cal.3d 161, 180.) A reasonable probability is " 'a probability sufficient to undermine confidence in the outcome.' " (*In re Cordero*, at p. 180.)

### C. Analysis

Defendant's trial counsel made the argument that defendant was not the person depicted in the security camera video. Trial counsel's decision not to emphasize that defendant's hairline on the date of his arrest—roughly one month after the security camera video was created—was different from the security video footage was a reasonable tactical decision for various reasons. First, as noted, the security camera footage is not clear. Perhaps the hairline of the person depicted in the video was different from defendant's hairline; or perhaps the visual distortions or lighting in the video merely created that illusion. Further, on the date defendant was arrested, his hair appeared to be slightly longer than the hair of the person depicted in the video. Trial counsel could reasonably have concluded that the jury would not have believed that the video showed a different hairline rather than defendant with closer cropped hair or differently lit hair.

Even if defendant's counsel had provided deficient performance, defendant has not shown that he suffered any prejudice. The jury viewed the security camera video, defendant's booking photograph, a side profile photograph of defendant which depicted his jawline tattoo, and defendant in the courtroom. While defendant's trial counsel did not emphasize the hairline of the man depicted in the security camera video, the jury had

the opportunity to view that video and come to its own conclusion regarding whether defendant was the person depicted in the video. The jury evidently concluded that any discrepancies between defendant's appearance in the security camera footage and his appearance later were not material to his guilt. There is no reasonable probability that the verdict would have been different had defendant's trial counsel emphasized the hairline of the man depicted in the security camera video as compared to defendant's hairline in his booking photograph. Defendant suffered no prejudice as a result of trial counsel's alleged failure to emphasize what defendant sees as the most persuasive evidence.

### 3. Assembly Bill 1869

Operative July 1, 2021, Assembly Bill 1869 eliminated many fines, fees, and assessments that courts have imposed under a variety of statutes, including former section 1203.1b, previously allowing collection of probation report fees. (Stats. 2020, ch. 92, §§ 2, 11, 47, 62.) Here, the parties agree, as do we, that any unpaid portion of the probation report fees ordered pursuant to former section 1203.1b are uncollectable and unenforceable as of July 1, 2021. We therefore vacate the portion of the judgment requiring payment of fees pursuant to former section 1203.1b. Any portion of those fees not collected before July 1, 2021, is unenforceable and uncollectable.

### DISPOSITION

The portion of the judgment imposing probation report fees pursuant to former section 1203.1b is vacated. As modified, the judgment is affirmed.

13.