Filed 8/10/22  P. v. Ibanez CA1/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>PEDRO ERASMO DIAZ IBANEZ,<br><br>    Defendant and Appellant. | A159525<br><br>(Sonoma County<br>Super. Ct. No. SCR-722520-1) |

Defendant Pedro Ibanez appeals after a jury convicted him of several counts of lewd acts against two minor victims and found true multiple-victim allegations under the "One Strike" law. On appeal, defendant contends that: (1) the trial court erroneously excluded evidence; (2) his trial counsel was ineffective; (3) the court incorrectly and confusingly responded to a question from the jury; and (4) cumulative prejudice requires reversal. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged with four counts of sexual intercourse with Jane Doe One (Doe One), a child who was 10 years of age or younger (Pen. Code, § 288.7, subd. (a),[1] counts 1, 3, 5, 7). He was also charged with multiple counts of lewd acts upon a child under 14 (§ 288, subd. (a) (288(a))): four involving Doe One (counts 2, 4, 6, 8); and two involving Jane Doe Two (Doe

---

[1]    All further statutory references are to the Penal Code.

Two) (counts 9 and 10).[2]  The charges concerning Doe One specified that counts 1 and 2 concerned conduct "In the bedroom—first time"; counts 3 and 4 concerned conduct "In the bedroom—the time when her sister was at the house"; counts 5 and 6 concerned conduct "In the bathroom"; counts 7 and 8 concerned conduct "The same day as the bathroom incident."  A One Strike multiple-victim allegation was alleged as to each of the section 288(a) counts. (§ 667.61, subds. (e), (j)(2).)

After trial in October and November 2019, a jury found defendant not guilty of counts 7 and 8, and could not reach a verdict on counts 1, 3 and 5. The jury, however, convicted defendant of counts 2, 4, 6, and 9 and found the One Strike multiple victim enhancements true as to each of those counts. The trial court dismissed counts 1, 3, and 5 pursuant to a motion by the People, and ultimately sentenced defendant to consecutive 25 to life terms for each of his section 288(a) convictions, for a total of 100 years to life.  The following is a brief summary of some of the trial evidence.

**A.  Prosecution Case**

*1.  Testimony of Doe One*

Doe One, who was 13 years old at the time of trial, testified as follows.

For about half a year when Doe One was around two years old, her parents took her to a woman for child care, and defendant was that woman's husband.  Defendant "raped" Doe One at his house, but at the time she did not understand what was happening.

Doe One first described an incident that started when she was sitting at the kitchen table while defendant's wife made food.  Defendant came home

---

[2]      After the People rested their case in chief, defendant moved for acquittal as to count 10 pursuant to section 1118.1.  The court granted that motion and dismissed the count.

for his lunch break and took her to his room.  Defendant put her on the bed and played a pornography video.  When the video ended, defendant told Doe One that she had to do the same thing, but Doe One refused.  Defendant slapped her, then forced himself on her.  Doe One felt defendant force his penis into her vagina and tried unsuccessfully to push him away.  The incident ended when defendant's wife knocked on the door to say the food was ready.  Doe One felt a stinging in her "vagina."  Her vagina was red, and she was in pain afterwards.  This was not the first time this type of incident occurred.

Doe One recalled another incident, when her sister went with her to defendant's home while an inspection was occurring at their apartment.  She could not recall how it began, just that she was playing with her sister in the living room, then she was with defendant on his bed in his room, with the door closed.  He held her in place and penetrated her; this time he was less aggressive than in the first incident she described and it hurt less.  The incident stopped when her sister knocked on the door after their mom called to say the inspection was over.  Defendant did not open the door and said Doe One was sleeping.  Doe One's sister went home, but eventually returned and said that Doe One had to go back home and that their father was getting impatient.  Doe One went home alone and remembered her father yelled at her when she arrived, telling her it was unsafe to sleep at other people's houses.

Doe One described another incident that occurred in the bathroom.  Though she was unsure when it happened in relation to the other described incidents, she recalled that defendant carried her into the bathroom, put her down on a laundry basket, touched her, removed her pants and underwear,

3

and penetrated her. This happened in the bathroom more than once, but Doe One had no specific memories of the other times.

Doe One had flashbacks about the incidents. The year prior to the trial, she reported the incidents to a school counselor. In the summer of 2019, she met Doe Two while at a friend's house. Afterwards, they messaged each other on Snap Chat, a messaging application. The two realized they were involved in the same case, but did not talk about the details of the incidents.

### 2. *Testimony of Doe Two*

Doe Two, who was 11 years old at the time of trial, testified as follows.

Doe Two was around five years old when defendant's wife babysat her. She could not recall how many times it occurred, but defendant removed her pants and underwear and touched her "private parts" in the living room with his hands, while she sat on a rolling chair.[3] She recalled one incident in which he stopped touching her because her father had come to pick her up. She told her father and her mother what happened that same day, but they did not believe her. She recalled meeting Doe One a "long time ago" through a mutual friend. She remembered messaging Doe One on Snap Chat, but they never talked about the details of what happened to either of them.

### 3. *Other witnesses*

The prosecution presented testimony from the victims' family members and others, as follows.

Testimony from Doe One's older sister included the following. She sometimes went to defendant's home with Doe One. When defendant was home, she and her sister would always go to his bedroom to watch a movie. In general, on such occasions, defendant would make them lay on his bed and go under the blankets, and he would close the doors, windows, and window

---

[3]     Doe Two indicated that by "private parts" she meant her vaginal area.

4

curtains; the room would be very dark. Defendant would play "kid's stuff, kid movies" and turn the volume up. Defendant "was usually wrapped around" her sister with his arms, laying very close to her, and she heard Doe One giggling. One day, when it was already dark out, defendant asked Doe One's sister to leave while Doe One remained; he told the sister that she should head home because her father was going to get worried, and that he was going to give Doe One a snack then send her home. The sister tried to ask Doe One if she wanted to leave, too, but Doe One did not respond, so she just left. Doe One ended up coming home after her sister was already in bed, and their father was angry. The next day, Doe One was uncharacteristically very quiet and distant. Doe One and her sister were very close, and they talked a lot. The sister could not recall how many times they went to defendant's house, but it was more than twice. After defendant started taking them to his bedroom and closing the door, Doe One's sister told her parents she did not want to go to defendant's house anymore.

Doe One's father testified defendant was a neighbor in the same apartment complex, who helped him find a job. He worked with defendant but had been laid off about two and a half years prior. He felt bad about being laid off, but said defendant was not responsible and he was not angry at defendant. The two kept in contact a little bit.

Doe One's mother testified that she stopped taking Doe One to defendant's wife for babysitting when Doe One was around three and a half years old, because Doe One said she no longer felt comfortable there and did not want to go there. She recalled that once Doe One stayed and fell asleep at defendant's house, and her older daughter went to pick her up. Doe One did not complain of pain after returning from defendant's home, except once she came home and her lower "feminine part" was red and irritated. Doe One

5

did not want to be touched and did not let her put cream on it, which was surprising. Sometimes Doe One returned home from defendant's house in clothes that were different than the ones she originally wore.

Doe Two's mother testified that defendant's wife babysat Doe Two when she was around four or five years old. She stopped taking Doe Two to defendant's wife for babysitting after Doe Two told her and Doe Two's father that a man "forced himself on her" and told her to "go to the bathroom and take off her clothes and she didn't want to do that." Doe Two's father had picked Doe Two up from defendant's home the day she reported this; he saw that she was trembling and thought it was wrong for defendant's wife to leave her alone with defendant. When Doe Two's younger sister needed babysitting, Doe Two's mother called defendant's wife to see what she was charging. Doe Two reacted by shouting not to take her sister there, and said she would rather stop going to school to watch her sister. Because of Doe Two's reaction, Doe Two's mother realized that something more serious had happened at defendant's home. She was afraid because when Doe Two was young and reported what had happened, she did nothing.

A school counselor testified that in March 2018, Doe One disclosed the abuse to her. Doe One indicated she realized that what happened was not okay after her parents talked to her about inappropriate touching and after she watched a movie in January 2018 that depicted a sexual assault.

Detective Walter Spiller testified about the investigation of the case, including the details regarding the forensic interviews of the victims, which were played for the jury. Doe One's parents provided Detective Spiller with the phone number of Doe Two's mother after he asked if they knew anyone else who went to the defendant's wife for child care. When Doe Two's

6

mother's reported her concerns, Detective Spiller set up a forensic interview for Doe Two.

Another detective who examined a laptop with a user account bearing defendant's name also testified. The detective found hundreds of adult pornography videos on the computer, but no child pornography.

Experts also testified at the trial. A nurse who qualified as an expert in sexual assault examinations testified she found nothing relevant during her non-acute physical examination of Doe One, which is what she expected given that the examination occurred years after the alleged incidents. The nurse noted Doe One reported that defendant verbally threatened her, saying: " 'if you tell anybody I will do more next time.' " Finally, a psychology expert in child sex abuse cases testified regarding "Child Sexual Abuse Accommodation Syndrome," a framework for explaining common behavior amongst child sex abuse victims.

**B. Defense Case**

Defendant testified on his own behalf, denying that he inappropriately touched Does One or Two or played pornography for Doe One. Discussing pretext phone calls between himself and Doe One's parents, defendant denied the accusations and did not recall asking for forgiveness from Doe One's father, indicating he only asked forgiveness for what they were going through or if he had done what the girl accused him of.[4] He indicated his wife never left him to watch the children she babysat, and by the time he got home from work, the children were already gone. He acknowledged children were there when he came home for lunch, and he sometimes tickled other children his

---

[4]  The prosecution did not introduce evidence of the pretext calls during its case-in-chief. Although defendant testified about the calls, the recordings themselves were not admitted into evidence.

wife babysat. He indicated he previously worked with Doe One's father, but they became distant after the father was laid off.

The defense called various witnesses, including defendant's daughter and other children whom defendant's wife babysat, who testified they never experienced or saw any inappropriate touching. Defendant's daughter testified defendant tickled her and other children being watched in the house, and one of the other children testified defendant would tickle her and her sisters.

Defendant's wife testified that defendant never took a child in her care to their bedroom, and that she never saw him touch a child inappropriately or suspected he was doing so. Defendant was never alone with Doe Two because of his work hours and Doe Two's school schedule. She confirmed that Doe Two suddenly stopped coming to her for babysitting. She denied ever sending Doe One home in different clothes and ever seeing defendant tickle any of the children she watched. Defendant had shown the wife adult pornography, and she knew he watched it, but she was uncomfortable with it because of her religion.

The defense also presented an expert in psychology and the psychology of memory, Dr. Daniel Reisberg, who testified in part about the creation of false memories. He described concepts associated with false memory, namely, "stereotype induction" (where ideas are introduced to people or children, who then create false narratives based on those ideas) and "secondary gain" (where a person chooses to lie because there is some positive effect to lying). Dr. Reisberg did not interview either of the victims, indicating he was not a mental health professional and does not make diagnoses.

8

## C. Prosecution Rebuttal

The prosecution presented testimony from several law enforcement witnesses in rebuttal. Among other things, Detective Spiller testified that he has prior experience doing pretext calls, and generally when people are approached with the type of serious accusation that confronted defendant, they will adamantly deny the accusation if they are not guilty. But here, during the initial pretext calls, defendant did not adamantly deny the accusations and instead asked for forgiveness, which was abnormal. Officer Zilverio Rivera, a Spanish speaking officer who assisted in conducting the pretext calls, confirmed that defendant asked for forgiveness. Officer Rivera testified some of defendant's requests for forgiveness were qualified—e.g., defendant asked for forgiveness for whatever may have happened or if that was what Doe One said—but others were not. Officer Rivera acknowledged that defendant never admitted doing what Doe One accused him of.

## DISCUSSION

### A. Exclusion of Evidence

Defendant contends the trial court erred by excluding evidence of statements that Doe Two made about her mother's sexual behavior at home. Specifically, he contends the court erred in prohibiting him and his wife from testifying about alleged statements Doe Two made about her mother, and by limiting the purpose of his daughter's testimony about Doe Two's statements. Defendant contends the exclusion of this evidence denied him due process, his right of confrontation, and his right to present a complete defense.

#### 1. Additional Background

Defendant's daughter testified that she sometimes spent time with Doe Two when Doe Two was in defendant's house. Doe Two sometimes talked about her mother bringing men home and said "she could hear what her mom

9

would do." Specifically, Doe Two said that she saw "her mom kiss other men [(not her father)] in front of her, and she would use her hands and go like this (indicating)," then defendant's daughter pushed her two hands together. This was the only thing that Doe Two ever said or did that caused defendant's daughter concern. In accord with defense counsel's request, the court admitted Doe Two's statements as relayed by defendant's daughter, not for the truth of the matter asserted, but for how it affected the witness's perception of Doe Two.

Next, while defendant's wife was on the stand, defense counsel asked if she ever grew concerned about things Doe Two said about her home life, and if Doe Two ever said anything about her mother having boyfriends at home. The trial court sustained the prosecutor's hearsay and relevance objections to both questions. Defense counsel then asked if Doe Two ever indicated that she was not staying at home because of situations between her parents. The court overruled the prosecutor's hearsay and relevance objections, and defendant's wife responded that Doe Two "would always tell about her mom and her dad." When defense counsel asked defendant's wife to relay what Doe Two said that was memorable, the prosecutor again objected on hearsay and relevance grounds. The court sustained the objection, stating it did not appear to be relevant. Defense counsel asked for a sidebar, then continued examining defendant's wife.

Later, outside the presence of the jury, defense counsel stated for the record that, at the sidebar, the court denied her request to ask defendant's wife about statements Doe Two made about her mother having boyfriends in the house and seeing her mother kiss other men. Defense counsel argued these "events" were relevant to Doe Two's "life experience, the circumstances surrounding her allegations and her awareness of sexual matters, or matters

10

beyond the scope of a then four or five year old's experience and understanding." The prosecutor noted Doe Two did not testify about any specific sexual conduct at her own home[5] and objected to defendant's wife providing hearsay evidence about such conduct. The court adhered to its ruling, noting it found no reference in Doe Two's testimony to boyfriends or men visiting or kissing her mother.

Finally, defendant testified that he did not see Doe Two much when his wife babysat her, but said that he would see Doe Two at his apartment complex's playground and when she would knock on his apartment door. When defense counsel asked what Doe Two would say about why she played outside, the trial court sustained the prosecutor's objection on hearsay grounds. Outside the jury's presence, defense counsel indicated Doe Two had told defendant that her mother was having sex with men for money at Doe Two's house and that she had seen them at her house. Defense counsel explained that she was trying to "advance the defense that this child's home life was troubling, confusing, potentially ripe for what might result in a false memory or allegation" and asserted that Doe Two's statement was "indicative of something." Defense counsel insisted this was not objectionable as hearsay because it was offered to show Doe Two's "state of mind, her emotional make-up, her life experience" and the fact "that the statement was made."

The prosecutor disagreed and argued the statements were being offered for the truth that Doe Two was exposed to sexual conduct in her home and that the evidence would only be relevant if Doe Two was actually exposed to

---

[5] On cross-examination, Doe Two testified she did not recall telling defendant's daughter anything about her mother being with other men in their family's home or telling anyone in defendant's family about any of her family's private business. Nor did she recall coming by defendant's home and talking to him and his daughter.

such conduct. The prosecutor noted that Doe Two was never asked about exposure to sexual conduct at home, and that the defense was now trying to get other people to testify about it. Defense counsel responded by arguing that whether or not the statements Doe Two made were true, they were relevant to her credibility. Defense counsel denied asking "what [Doe Two] saw in her house, what her mom's sexual activities were" and acknowledged "that is ultimately not relevant."

The trial court ruled the proffered statements from defendant were hearsay and no hearsay exception applied. Moreover, the court invoked Evidence Code section 352 in concluding that admitting the statements would be confusing for the jury and result in an undue consumption of time.

### 2. Discussion

Defendant's opening brief does not address the fact that, at defense counsel's request, the trial court admitted and limited consideration of defendant's daughter's statement that Doe Two said she saw her mother kissing men in her house. Nor does he directly challenge the court's decision sustaining hearsay and relevance objections to defendant's wife's proposed testimony about Doe Two's supposed statements on the topic, or its decision precluding defendant, based on hearsay grounds and Evidence Code section 352, from testifying that Doe Two said her mother was having sex with men for money at their house.

Instead, relying solely on *Franklin v. Henry* (9th Cir. 1997) 122 F.3d 1270 (*Franklin*), defendant argues the court's rulings violated his constitutional rights of due process, cross-examination, and to present a meaningful defense. Analogizing this case to *Franklin*, he claims that if Doe Two's statements about her mother engaging in sexual conduct with other men in their house were false, then this would have been highly relevant to

12

Doe Two's credibility insofar as "defense counsel could have argued that if Doe Two was capable of making a false accusation of sexual misconduct against her own mother, surely she would be equally or more capable and willing to make . . . [a] false allegation of sexual misconduct against [defendant]." Alternatively, defendant claims Doe Two's statements should have been admitted because if they were true, then they would be relevant "to show that the complaining witness had a source of experience, knowledge, and information as to the sexual activity independent of the accusation against the defendant."

Initially, we note the People contend defendant forfeited his present constitutional arguments by failing to specifically raise them below with regard to the proffered testimony of any of the three witnesses. (*People v. Blacksher* (2011) 52 Cal.4th 769, 821 ["defendant's contention that, despite the rules of evidence, the federal constitutional right to present a defense prevails over state evidentiary rules to invalidate the court's rulings" was forfeited because it was not raised below]; *People v. Daniels* (2009) 176 Cal.App.4th 304, 320, fn. 10.) As for the court's admission of defendant's daughter's testimony for the limited purpose of considering how Doe Two's statements affected the witness's perception of Doe Two, the court imposed that limitation at defense counsel's request. Nevertheless, even if defendant had not forfeited the constitutional claims, we would find no error.

" ' "As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense" ' " and " '[c]ourts retain . . . a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice.' " (*People v. Ghobrial* (2018) 5 Cal.5th 250, 283.) Although federal constitutional principles are violated when the application

13

of state evidentiary rules prevent a defendant "from making an effective challenge to the prosecution's case or from presenting crucial exculpatory evidence" (*People v. Espinoza* (1992) 3 Cal.4th 806, 818), the "[a]pplication of ordinary rules of evidence to exclude ' "defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense." ' " (*People v. Anderson* (2012) 208 Cal.App.4th 851, 880.) "For a defendant's constitutional rights to override the application of ordinary rules of evidence, ' "the proffered evidence must have more than 'slight-relevancy' to the issues presented. . . . The proffered evidence must be of some competent, substantial and significant value." ' " (*Ibid*.)

In *Franklin*, *supra*, 122 F.3d 1270, a child accused the defendant of sexual abuse, reporting in part that he licked her " 'private.' " (*Id*. at p. 1271.) In his defense, the defendant tried to introduce his own testimony that the victim, in his presence, told her brothers that her mother " 'licked her private.' " (*Id*. at p. 1272.) In discussing the victim's statement concerning her mother, the state Court of Appeal had stated that the victim "falsely accused" her mother and noted "[t]he statement was presented as a product of [the victim's] imagination." (*People v. Franklin* (1994) 25 Cal.App.4th 328, 335, fn. 4.) While concluding the trial court erroneously excluded the evidence because it was relevant to the victim's credibility, the state Court of Appeal nevertheless concluded the error harmless because ample other impeachment evidence was introduced. (*Id*. at pp. 335–337.) The United States Court of Appeals for the Ninth Circuit disagreed and granted the defendant relief on habeas. Specifically, the Ninth Circuit determined the error at issue was of constitutional magnitude because the excluded testimony "bore on the credibility of the only percipient witness" against the defendant, and if believed, would have shown the victim was capable of

14

fantasies about her mother analogous to the accusations she made against the defendant. (*Franklin*, 122 F.3d at p. 1273.) In reversing the defendant's conviction, the Ninth Circuit explained the error could have been harmful, insofar as the case hinged on the jury believing the victim, and the excluded evidence "might have tipped the verdict to acquittal." (*Ibid.*)

Defendant fails to show a constitutional error here as in *Franklin*. First of all, *Franklin* involved an alleged sexual molestation victim who had made a false accusation of sexual molestation against her mother. (*Franklin*, *supra*, 122 F.3d at p. 1272.) As *Franklin* explained, the victim's false accusation against her mother showed that the victim was "capable of fantasies about her mother analogous to the charges she made against Franklin." (*Id.* at p. 1273.) That stands in sharp contrast with the instant situation. Here, Doe Two's supposed statements did not falsely accuse her mother of sexually molesting anyone, though they indicated her mother engaged in sexual conduct with other men in their house and did so for money (according to defendant). While the content of the excluded statements appeared sexual in a broad sense, they were not analogous to the sexual abuse accusations leveled against defendant. Thus, even assuming the falsity or inaccuracy of Doe Two's statements, they fall far short of showing that Doe Two was capable of "analogous" fantasies about being molested by defendant.

More fundamentally, there was no dispute in *Franklin* that the victim's statement about her mother licking her private was false and the product of her imagination. (See *People v. Franklin*, *supra*, 25 Cal.App.4th at p. 335, fn. 4.) The *Franklin* court could thus conclude that the victim's statement concerning her mother bore on the victim's credibility. (*Id.* at p. 335.) Here, the same cannot be said of Doe Two's alleged statements. Notably, defense

15

counsel below never attempted to ask Doe Two or her mother about sexual affairs in their own house and even indicated her belief that the matter was "ultimately not relevant." Moreover, there is no evidence in the record bearing on the truth or falsity of Doe Two's alleged statements. Defendant seems to acknowledge no such evidence exists, as he merely posits alternative hypothetical arguments about how the statements might be relevant if false or if true.

Ultimately, the defense never established that Doe Two's alleged statements about her mother were false, and therefore never established the impeachment value of the statements.[6] (Evid. Code, § 350 ["No evidence is admissible except relevant evidence."]; *id.*, § 210 [" 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."]; cf. *People v. Tidwell* (2008) 163 Cal.App.4th 1447, 1457–1458 [a prior false accusation of sexual molestation is admissible to challenge a victim's credibility, but only if it is first established that the prior accusation was false].) In sum, defendant fails to show the trial court's exclusion of evidence having only questionable impeachment value amounted to a constitutional error comparable to the error found in *Franklin*.

Defendant alternatively contends that Doe Two's statements, if true, would have been relevant "to show that the complaining witness had a source

---

[6] Defendant argues defense counsel in this case, as in *Franklin*, treated Doe Two's proffered statements as the product of the victim's imagination. This claim is unsupported by any record citations, and our review of the record reveals defense counsel took no definitive position on the veracity of Doe Two's statements, arguing instead for their admission regardless of whether they were true or false.

of experience, knowledge, and information as to the sexual activity independent of the accusation against the defendant." But this contention suffers from a similar problem as discussed above: without evidence that Doe Two's statements were actually true, defendant cannot show the statements had evidentiary value in terms of proving that Doe Two acquired sexual knowledge at home. Moreover, even if true, the excluded statements were of questionable relevance because they were in no way analogous to the sexual abuse accusations leveled against defendant. Defendant cites no authority holding that constitutional error may properly rest on the exclusion of evidence that is speculative or of marginal relevance.[7] (*People v. Anderson, supra*, 208 Cal.App.4th at pp. 880–881.)

Accordingly, we reject defendant's claim that the limitation or exclusion of testimony concerning Doe Two's alleged statements about her mother denied him his constitutional rights.

## B. Ineffective Assistance of Counsel

Defendant argues his trial counsel rendered ineffective assistance during closing argument. Specifically, he contends defense counsel incompetently failed to argue to the jury that the defense expert's testimony established that Doe One was "too young and physiologically incapable of forming long-term memories" at the time that defendant's wife babysat her. (Capitalization omitted.)

---

[7] Having discerned that the record contains no evidence concerning the truth of Doe Two's statements, we need not address defendant's additional argument that the evidence would have been admissible under Evidence Code section 1250 "to explain how Jane Doe Two would have been able to make a complaint of improper sexual activity against defendant." But we take a moment to note that Evidence Code section 1250, subdivision (b), states: "This section does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed."

### 1. *Additional Background*

The People charged defendant with sex crimes against Doe One occurring on or between April 19, 2008 and April 18 and 19, 2011. Doe One testified that she was born in 2006,[8] and that defendant's wife babysat her for about half a year when she was around two years old. Other witnesses gave testimony essentially confirming that defendant's wife babysat Doe One for a few months when she was two years old or, at most, three and a half years old.

Dr. Reisberg, the defense expert in psychology and the psychology of memory, testified at trial concerning the accuracy of childhood memories. In his words: "Basically, from birth until age two, or two and a half, the vast majority of people have essentially no verbally reportable memories at all. They do have memories. They do have reflexes, are able to learn. But if you're focusing on the kinds of memory somebody could, you know, sit in this chair and testify about, report a memory, for the vast majority of children it's just nothing prior to age two and a half or sometimes three. [¶] Once you get past that stage, . . . for children roughly from age three until maybe six or seven, maybe eight at the outside, you can get accurate reports. But it is extremely careful [*sic*], important to question the child in exactly the right way. It's because children of that age are massively suggestible. It's not because their memories are flawed. It's because children of that age are just doing a fabulous job of absorbing all sorts of information. Often they get confused about where they got their information . . . . That kind of confusion is confusion that can happen for anybody of any age. [¶] But it's a much greater problem for children basically in the preschool years. Once you get

---

[8]     The dates of the offenses charged put Doe One between the ages of two and five.

past age seven or eight or so, overall, the pattern of memory functioning starts to look pretty much like you'd expect in an adult . . . ." Dr. Reisberg went on to discuss memory for adolescents, as children experience puberty, and indicated the memories of 16 and 17 years olds are the "same until memory starts to fade later in life."

During closing argument, the defense attacked Doe One's testimony regarding defendant's abuse of her. Among other things, the defense contended that Doe One's age and the amount of detail she could recall made her testimony implausible and "suspicious" and unbelievable.

### 2. *Discussion*

Defendant contends his trial counsel rendered ineffective assistance during closing argument by failing to argue that "undisputed expert testimony established that Jane Doe One was too young and physiologically incapable of forming long-term memories" at the time of the alleged crimes. (Capitalization omitted.) In defendant's view, Dr. Reisberg's testimony "provided an objective reason for the jury to conclude that [Doe One's] testimony . . . was biologically and physiologically impossible," and trial counsel performed deficiently by failing to contend during closing argument that Doe One was unable to form memories at the time of the alleged crimes.

To demonstrate ineffective assistance, a defendant must show both that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and that the deficient performance was prejudicial. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) "A defendant who raises the issue on appeal must establish deficient performance based upon the four corners of the record. 'If the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and

failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal.' " (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003.) "These standards apply with particular force at closing argument because, . . . '[t]he decision of how to argue to the jury after the presentation of evidence is inherently tactical . . . .' " (*People v. Gamache* (2010) 48 Cal.4th 347, 391.) "Reversals for ineffective assistance of counsel during closing argument rarely occur; when they do, it is due to an argument against the client which concedes guilt, withdraws a crucial defense, or relies on an illegal defense." (*People v. Moore* (1988) 201 Cal.App.3d 51, 57.)

In this case, defendant fails to establish deficient performance on his counsel's part. During closing argument, defense counsel presented a detailed attack on the prosecution's case, which included challenging Doe One's credibility given her age at the time of the alleged molestation. Defense counsel also told the jurors to use their "common sense about how life works" and argued that Doe One testified with "tons of detail" that made her memories "suspicious and strange." But, defense counsel did not specifically argue—as defendant now complains—that per Dr. Reisberg's testimony, Doe One was "biologically and physiologically incapable" of remembering what occurred while defendant's wife babysat her.

The record on appeal fails to disclose what reasons, if any, counsel had for failing to make the foregoing argument. But we can readily perceive a possible satisfactory explanation for the omission. Namely, Dr. Reisberg did not state categorically that all children from birth up to an exact age are biologically and physiologically incapable of forming long-term memories. Rather, Dr. Reisberg testified that "the vast majority" of people from birth to the age of two or two and a half, or "sometimes three," have no verbally reportable memories, but once past that stage, "roughly from age three until

20

maybe six or seven, maybe eight at the outside, you can get accurate reports." Thus, Dr. Reisberg's testimony would not have supported an airtight assertion that Doe One lacked the capacity to remember what happened to her.

Acknowledging that Dr. Reisberg's statement was not categorical, defendant's reply brief contends that defense counsel unreasonably failed to argue that "it was *highly unlikely* that Jane Doe One had an actual memory of any molestation because the 'vast majority' of children her age lack the physiological and psychological capacity to do so." (Italics added.) But, again, we can readily perceive a reasonable explanation for why counsel did not make that argument: such an assertion would have been met with obvious rebuttal argument that (1) Dr. Reisberg's testimony did not purport to conclusively establish that children of a certain age cannot form long term memories; (2) Dr. Reisberg had not examined Doe One, and there was no evidence specifically indicating any inability on Doe One's part to form memory at an early age; (3) there was evidence that Doe One was three years old or older when defendant's wife was caring for her; and (4) Dr. Reisberg otherwise acknowledged that, overall, the evidence is clear that correct memories far outnumber incorrect ones and that in the majority of cases, memories are accurate.

Defendant fails to address all the evidence of Doe One's age, which undercuts the factual premise of his ineffective assistance contention, i.e., that Doe One was only two years old when defendant's wife babysat her. As the record reflects, Doe One's mother—the parent responsible for arranging Doe One's childcare and enrolling her in school—testified that Doe One was three years old while defendant's wife babysat for her and around three and a

21

half years old when defendant's wife stopped providing child care.[9] Specifically, Doe One's mother testified that defendant's wife babysat Doe One for "about six months" or "[f]rom two, to three, to six months" "but no more." When asked to clarify whether she stopped taking Doe One to defendant's wife for babysitting before Doe One started at Head Start, Doe One's mother responded: "No. She was already going to Head Start. She started to go to Head Start at the age of three." Doe One's mother was then asked: "So she was going to Head Start when you switched her from [defendant's wife] to another private babysitter in addition to Head Start?" Doe One's mother responded, "Yes." In response to a subsequent question, Doe One's mother answered that Doe One was "[a]round" three and a half at the time when Doe One said she did not want to go to defendant's wife for babysitting anymore.

This evidence put Doe One outside the age period that Dr. Reisberg suggested was the norm for when children have no "verbally reportable" memories. Combined with Dr. Reisberg's testimony that correct memories far outnumber incorrect ones and that memories are accurate in the majority of cases, the prosecutor could have made a damaging rebuttal argument that, according to Dr. Reisberg's testimony, Doe One likely did have the capacity to

---

[9]     Defendant's opening brief asserts that the prosecutor argued to the jury that Doe One was two years old when she was being cared for by defendant's wife. In support, defendant points to the prosecutor's closing argument stating: "I think it came out pretty clearly in the testimony that [Doe One] was really between two and three in terms of having been there, mostly before Head Start."

To the extent defendant is suggesting this was a concession by the prosecutor that Doe One was not beyond two years old when being babysat by defendant's wife, we disagree. In making the quoted argument, the prosecutor clearly was addressing the element of the charged offenses that the victims be under 10 or 14 years of age.

remember defendant's molestation of her and that her memory likely was accurate.

In sum, we reject the appellate claim of ineffective assistance.

**C. Response to Jury Questions**

Defendant contends he was deprived of due process and a fair trial because of the court's erroneous and confusing response to a jury question.

*1. Additional Background*

During deliberations, which spanned about six days, the jury submitted numerous questions and requests to the court. As relevant here, on the second day of deliberations, Juror No. 6252 submitted the following question: "It has repeatedly come up that something must not have happened because they <u>didn't</u> present evidence to say it didn't happen. A juror referred to this as 'negative evidence'. [¶] Example—there was no testimony that [defendant's wife] was in trouble for any of this and if this is true she should be therefore . . . [¶] Are we supposed to be . . . considering what evidence that was <u>not</u> presented? Or <u>Lack</u> of evidence?"

The trial court discussed the question with counsel.

"[Prosecutor]: . . . I think that we should respond to them that they are not to be considering evidence that was not presented. Sort of their last part was 'are we supposed to be considering what else was not presented?'

"THE COURT: I think maybe the start of the response should be [defendant's wife] is not a defendant or an accused person relative to this case and that they're not to speculate about anything that was not introduced as evidence at trial.

"[Defense counsel]: I think if there is something that hasn't been proven, they can't treat that as having been proven.

23

"THE COURT: Let me read to you my attempt at responding so this . . . . '[Defendant's wife] is not a defendant or person accused in this case. The defendant is not required to prove he's innocent. He's innocent until proven guilty. If no evidence was presented to satisfy one or more of the required elements of the crime, then the defendant is entitled to prevail on that element and must be found not guilty of that crime. Please refer to jury instructions 220, 223, 224, 225, 300, 1110, 1127.'

"[Prosecutor]: . . . I think it would be important to include as well that they are not to speculate on matters that—upon which there was no evidence presented in this case.

"[Defense counsel]: My concern is that what they're—at least one interpretation that is if the defense didn't prove that something didn't happen, in other words, there is no evidence that it happened, how are they supposed to treat that absence of evidence? And I think if there is no evidence, you treat it as there is no evidence about that. If that is an essential piece of establishing guilt, then that's a lack of evidence. [¶] But, right? But they shouldn't speculate and fill in the gaps about one way or the other, right? It's just that it hasn't been proven and you're the only one that—I mean, you're the only one with the burden.

"[Prosecutor]: Right. And I think that the Court's suggested answer does incorporate that. Because I think that is one of the few questions that may be being asked here. And I agree that would be a concern that needs to be addressed. I do think that, just in my reading of the question, it appears to me what may be happening, they're just having a very open discussion and it's branching off into areas they would maybe like to know more about, such as did [defendant's wife] get in trouble for this, which we don't have evidence

24

on, et cetera, et cetera. So I would like to see if it does reign [*sic*] in their discussion of what was the evidence presented, does that prove the crime?"

The trial court then proposed the following response and the parties discussed it:

"THE COURT: 'Are we supposed to be considering what evidence that was not presented?' I'll answer no. You may consider lack of evidence and maybe leave it at that.

"[Defense counsel]: You may consider lack of evidence and then refer them to those other instructions maybe.

"THE COURT: Yeah.

"[Prosecutor]: Uh-hum.

"THE COURT: . . . I think that's probably the clearest way to respond to this.

"[Defense counsel]: Yes. As opposed to going down the rabbit hole. I would rather not address the example they give, because it seems like it's just an example. . . ."

The trial court then typed up a response, which tracked what was discussed, and allowed the parties to review it. Aside from a minor edit to that typed response, that the parties agreed on (removing the word "the" from a sentence), the parties otherwise indicated their approval. The court's typed response ultimately read as follows: "Question . . . : 'Are we supposed to be considering what evidence was <u>not</u> presented?' [¶] Court's Response: No. [¶] Question . . . : 'Or <u>Lack</u> of evidence?' [¶] Court's Response: You may consider lack of evidence in reaching your verdict. [¶] Please refer to jury instructions 220, 223, 224, 225, 300, 1110 and 1127."

### 2. *Discussion*

Defendant contends the trial court erred by failing to request clarification from the jury because the question was confusing. Defendant further contends the court's responses to the question were internally contradictory and erroneous.

"The court is under a general obligation to 'clear up any instructional confusion expressed by the jury,' but '[w]here . . . the original instructions are themselves full and complete, the court has discretion . . . to determine what additional explanations are sufficient to satisfy the jury's request for information.' [Citations.] [¶] When the trial court responds to a question from a deliberating jury with a generally correct and pertinent statement of the law, a party who believes the court's response should be modified or clarified must make a contemporaneous request to that effect; failure to object to the trial court's wording or to request clarification results in forfeiture of the claim on appeal." (*People v. Dykes* (2009) 46 Cal.4th 731, 802; see *People v. Loza* (2012) 207 Cal.App.4th 332, 350.)

We conclude defendant forfeited his claims concerning the court's response to the jury's question. Defense counsel never asked the trial court to request that the jury clarify its question, and she assented to the court's proposed answer. The trial court responded to the jury's questions with generally correct statements of the law. First, the court's response "[n]o" to the question " '[a]re we supposed to be considering what evidence was <u>not</u> presented' " is generally correct. (See *People v. Centeno* (2014) 60 Cal.4th 659, 669 ["jury may only decide the issue of guilt based on the evidence presented at trial"]; *People v. Leonard* (2007) 40 Cal.4th 1370, 1414 ["jury's verdict in a criminal case must be based on the evidence presented at trial, not on extrinsic matters"].) Indeed, the court's response was consistent with

26

its instruction under CALCRIM No. 200, which states: "You must decide what the facts are. It is up to all of you, and you alone, to decide what happened, *based only on the evidence that has been presented to you in this trial*." (Italics added.)

Second, the court's response to the jury's other question—i.e., "[the jury] may consider lack of evidence in reaching [its] verdict"—was also correct. "Reasonable doubt may arise from the evidence presented at trial or the ' " 'lack of evidence.' " ' " (*People v. Westbrooks* (2007) 151 Cal.App.4th 1500, 1508; see *Johnson v. Louisiana* (1972) 406 U.S. 356, 360 [reasonable doubt is one " ' "based on reason which arises from the evidence or lack of evidence" ' "].) The court correctly informed the jury it could consider lack of evidence, then pointed the jury to the standard instructions about reasonable doubt, direct and circumstantial evidence, the elements of the charged offenses, and the principle that not all available evidence must be presented. (CALCRIM Nos. 220, 223, 224, 225, 300, 1110 and 1127.)

In arguing to the contrary, defendant claims the jurors' questions about evidence "not presented" and "lack of evidence" were really just a single inquiry about whether they could consider the lack of evidence, and so the court's two answers conflicted with each other. (Underlining omitted.) This suggested interpretation is not manifest, especially given the jury's preface to its questions. Indeed, neither defense counsel nor the prosecutor perceived the jury as asking a single question, and both acceded to the trial court's responses. And after receiving the court's responses, the jurors expressed no confusion and requested no clarification regarding what they were told. While we acknowledge the jury worded its inquiry in a way that, at least arguably, was somewhat ambiguous, the court's responses were nonetheless, as indicated above, generally correct statements of law requiring objection by

27

trial counsel to avoid forfeiture. (*People v. Dykes*, *supra*, 46 Cal.4th at p. 802; *People v. Loza*, *supra*, 207 Cal.App.4th at p. 350.)

Defendant claims the trial court's answer to the jury's first question contradicted its answer to the second, resulting in the jury not being instructed that it could consider a lack of evidence as contributing to reasonable doubt. We are not persuaded.

Even if we assume both that the jury's inquiry was ambiguous and that its ambiguity rendered the court's response seemingly inconsistent, we must still assess " 'whether there is a " 'reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." ' " (*People v. Mills* (2012) 55 Cal.4th 663, 677.) " '[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation. The question is " 'whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process.' " [Citations.] " '[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.' " ' " (*Ibid.*) "The reviewing court also must consider the arguments of counsel in assessing the probable impact of the instruction on the jury." (*People v. Young* (2005) 34 Cal.4th 1149, 1202.)

Here, there is no reasonable likelihood that the jury applied the arguably ambiguous answer to the first question in the suggested manner. "Jurors are presumed to be intelligent people, capable of understanding and correlating all instructions." (*People v. Ayers* (2005) 125 Cal.App.4th 988, 997.)

To begin with, it is highly improbable that the jury received the trial court's response and thought that the judge was providing it with directly contradictory answers to synonymous questions in one breath. Even if it had

been attempting to ask a single question, the jury is far more likely to have understood the court as perceiving their questions as two separate ones that necessitated two distinct answers.

As for the trial court's answer "[n]o" to the question worded " '[a]re we supposed to be considering what evidence was <u>not</u> presented,' " that response was consistent with CALCRIM No. 200, which instructed the jury it must decide the facts based only on the evidence presented. As for the jury's second question, the court responded with the clear statement, "You may consider lack of evidence in reaching your verdict," then specifically referred the jury to other instructions, such as the instructions concerning reasonable doubt and elements of the crimes. The court also gave CALCRIM No. 103 and CALCRIM No. 220, which effectively instructed that "a lack of evidence could lead to reasonable doubt." (*People v. Flores* (2007) 153 Cal.App.4th 1088, 1093.)

Defense counsel capitalized on the force of these instructions during closing argument by urging the jurors to entertain a reasonable doubt as to the charges due to lack of evidence or the state of the evidence. For example, defense counsel noted that the prosecution did not present Doe One's medical records; that Doe One "did not demonstrate the kind of fear that a person would have if they're having flashbacks of violent rapes coming in to court" or when she reported the crimes to her school counselor; that Doe One did not describe certain things, e.g., defendant's penis or his erection or the clothes defendant wore; that Doe One's mother never saw signs or "physical examples" of abuse and had no concerns; that no child pornography was found on a laptop found in defendant's home; and that no evidence of grooming (of a predatory nature) was presented. In response, the prosecution did not argue to the jurors that they could not consider such lack of evidence;

29

rather, the prosecution simply disputed whether some of the evidence to which the defense alluded was truly lacking, or whether the claimed absence of certain evidence had the significance that the defense claimed.

Finally, the outcome at trial undercuts defendant's claim of juror confusion and/or misdirection. After receiving the court's instructions and hearing all the defense reasons why guilt had not been proven beyond a reasonable doubt, the jury ended up not finding defendant guilty of any of the four counts of sexual intercourse involving Doe One in violation of section 288.7, subdivision (a). This outcome indicates that the jury understood the given instructions, particularly the reasonable doubt standard, and applied that standard carefully. (Cf. *People v. Ellison* (2011) 196 Cal.App.4th 1342, 1353 ["the jury acquitted defendant of the three most serious charges, demonstrating that it understood the applicable burden of proof as it was instructed, and applied it to defendant's advantage as to the acquitted counts"].)

In sum, we reject defendant's instruction-based challenges.

## D. Cumulative Effect of Errors

Defendant argues the cumulative effect of the claimed errors requires reversal. Because defendant has failed to demonstrate error on his properly preserved appellate contentions, we reject the claim.

## DISPOSITION

The judgment is affirmed.

_____

Fujisaki, J.

WE CONCUR:


_____

Tucher, P.J.


_____

Petrou, J.

*People v. Ibanez* (A159525)