Filed 5/29/26  P. v. Somerville CA3

<u>NOT TO BE PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

| | |
|---|---|
| THE PEOPLE,<br>    Plaintiff and Respondent,<br><br>    v.<br><br>ROBERT ALSTON SOMERVILLE,<br>    Defendant and Appellant. | C102004<br><br>(Super. Ct. No.<br>STKCRFE20220001128) |

Defendant Robert Somerville was living in a commercial building in Stockton. Early one morning, he woke to the sound of someone trying to get inside the building. Not realizing there was a fire outside and firefighters were trying to get in, defendant grabbed his gun, announced he had a firearm, told the perceived intruders to move away, and shot "a couple rounds at the door."  Firefighter Captain Max Fortuna (captain) was struck and died.  A jury found defendant guilty of second degree murder.

Defendant contends his conviction should be reversed for four reasons:  (1) the presence of uniformed firefighters and a fire engine at trial denied him a fair trial; (2) his counsel's closing argument violated his Sixth Amendment rights; (3) the trial court prejudicially erred by refusing to instruct the jury on the right to defend real or personal property; and (4) cumulative prejudice from these errors warrants reversal.  We find no error to accumulate and affirm.  Undesignated statutory references are to the Penal Code.

1

FACTUAL AND PROCEDURAL BACKGROUND

Early in the morning on January 31, 2022, a fire department dispatcher received multiple calls regarding a fire near the Crosstown Freeway and Aurora Street in Stockton. The dispatcher instructed Engine 2 to respond and described it as an outdoor fire. A few minutes later, an alarm company called the dispatcher to report an audible alarm at a commercial building at an address on South Aurora Street. The dispatcher then updated Engine 2 on the building alarm and location.

Engine 2 arrived carrying three firefighters – the driver, a probationary firefighter, and captain. After opening the outer property gate with a saw, probationary firefighter started spraying the area. Captain told them they needed to get inside the building, so he and driver went to a roll-up door and started cutting into the padlocks with a saw and an angle grinder.

Meanwhile, inside the building, defendant was asleep in his room. One of his employees (employee) was also inside the building sleeping in a trailer. Defendant woke to the sound of cutting noises in the back of the building that made him think someone was trying to break in. He didn't know there was a fire happening. He did smell smoke, but it smelled the "same way [as] when you're cutting metal." He "went out there and said, 'Move away from the building. I have a firearm.' " After "nobody said anything," he "squeezed a couple of rounds at the door," specifically "down in the corner" because he was "not trying to shoot anybody." He just wanted to "scare them off" because he: (1) had a "problem with people trying to break in," (2) had "a lot of valuable equipment in there," (3) had a "problem in the back trailer with homeless people," and (4) figured people brazen enough to break in had to be armed. He also had macular degeneration and could not see well in the dark. At some point, he woke employee and told her to call for help, which she did by calling 911 twice. Employee later testified that defendant saved her life that day by waking her up.

2

Back outside, captain suffered a single gunshot wound to the chest that perforated his heart.

Defendant was not sure why police detained him. When detectives told him a firefighter had been shot, he inquired if the firefighter had been badly injured. He asked for more information about the firefighter's condition and was shocked to learn he had died. He asked about the firefighter's age and if he had a family.

Detectives questioned defendant for about an hour that morning. At first, defendant said he told employee to call the police *after* he fired, but later he said he told her to call the "fire department. Or 9-1-1" *before* he fired. Defendant also told detectives he never heard a fire alarm until after he had fired the shots, and he insisted he never intended to shoot anyone. He told the detectives he had "just used poor judgment" (and "there's nothing I can say to express the remorse that I feel right now for this guy and this family. . . . I'm fucking going to prison. I know that. I guess it'd be like negligent homicide, or something along that line." He admitted, "I just did something stupid that an intelligent person probably should have used a little bit more forethought."

Defendant was charged with murder. At the start of the trial, the court instructed the jury to not "let bias, sympathy, prejudice or public opinion influence [its] assessment of the evidence or [its] decision." Closing arguments emphasized this instruction: the prosecution advised the jury not to let sympathy for the fire department or defendant come into its analysis, and defense counsel advised the jury not to base its decision on feeling bad for captain's family or coworkers. The trial court repeated the bias instruction after closing arguments.

The trial court also read instructions on homicide (CALCRIM No. 500), self-defense (CALCRIM No. 505), defense against harm to person within home or on property (CALCRIM No. 506), robbery, burglary, and larceny (CALCRIM Nos. 1600, 1700, & 1800), second degree murder with malice aforethought (CALCRIM No. 520),

3

voluntary manslaughter based on heat of passion (CALCRIM No. 570) and imperfect self-defense (CALCRIM No. 571), and involuntary manslaughter (CALCRIM No. 580).

The jury found defendant guilty of second degree murder. After denying defendant's motion for new trial and his motion under *People v. Marsden* (1970) 2 Cal.3d 118, the trial court sentenced defendant to 15 years to life in prison.

Defendant timely appeals.

## DISCUSSION

### I. *Firefighter and Firetruck Presence at Trial*

A. Additional Background

The court considered and granted several media requests to cover various pretrial proceedings. Defendant asked the court to exclude "victim impact evidence" from the courtroom including firefighter uniforms, arguing this evidence compromised defendant's right to a fair trial. The court denied the motion but allowed defendant to revisit the issue if he felt the balance had become prejudicial.

On the first day of trial, counsel noted there were "approximately 30 or more [uniformed] firemen outside" ready to come in. The court (1) commented that the courtroom could not seat that many and (2) gave priority seating to defendant's and captain's audience. The court also cautioned that it might have some spectators removed if it became inherently prejudicial or put undue pressure on the jury. After the audience was seated, the court stated the courtroom could seat 36 people, and it did not feel there was an overwhelming number of people in uniform that would affect defendant's right to a fair trial. In particular, there was one person in uniform on the right side and a handful on the left.

One week later, defense counsel noted counsel had been keeping track of the uniform presence. Counsel reported as follows: on day one, there were 7 to 8 firemen; days two and three, 15; day four, 12; and day five, 17 to 18. The court responded that it had been "keeping a lookout" and there was "never more than half with firefighters."

4

The court observed a mixture of civilians and uniformed firefighters, with the majority being civilians. The next trial day, the court noted "there were only two uniformed officers."

After the jury rendered its verdict, defendant filed a motion for new trial. Among other things, he argued that the uniformed firefighter presence denied him a fair trial, claiming there were over 25 uniformed firefighters in the courtroom at times and the hallway was "packed with clusters of firefighters in uniform" in the morning and after lunch. At the hearing on the motion, defendant also argued that "[E]ngine 2 [had] circled this courthouse almost every day during the lunch hour."

The court denied the motion, citing (1) its records on the number of uniformed firefighters in the courtroom; (2) the fact that the jury went to the jury room rather than the hallway during breaks; (3) the fact that it did not witness or become aware of any intimidating conduct; (4) the fact that the jury never saw more uniformed firefighters than civilians; (5) the right of firefighters to watch the trial just like any member of the public; and (6) the jurors' agreement during voir dire not be influenced by hearing a firefighter case or having firefighters in the audience.

B. Contention and Analysis

Defendant contends the presence of uniformed firefighters in the courtroom and the circling of Engine 2 during the lunch hour denied him a fair trial. In support, he cites the number of firefighters in the hallway in the morning and at lunch and the many media requests indicating the "local community's close and strong relationship with the firefighters." We are not persuaded.

We do not address the Engine 2 issue on the merits. Defendant did not mention this issue until oral argument on his motion for new trial and did not provide justification for his delay. For these reasons, we consider this issue forfeited. (See *Tindall v. County of Nevada* (2025) 112 Cal.App.5th 78, 90 [raising issue for first time in oral argument on motion insufficient to preserve for review]; *People v. Freeman* (1994) 8 Cal.4th 450, 513

5

[waiver results from defendant's failure to object to purported misconduct].) By contrast, defendant adequately preserved the uniformed firefighter issue, so we turn to its merits.

"In determining whether the presence of uniformed officers denies a defendant's right to a fair trial, a reviewing court must look 'at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over.' " (*People v. Woodruff* (2018) 5 Cal.5th 697, 757.) "We evaluate the level of prejudice attributable to a particular courtroom scene based on the ' "totality of the circumstances." ' " (*People v. Ramirez* (2021) 10 Cal.5th 983, 1015 (*Ramirez*).) Those circumstances "may include the number of uniformed officers present, the location and grouping of the officers in the gallery, the ratio of uniformed officers to plainclothes spectators, the officers' conduct, the charged crime, the arguments of counsel, and the local community's relationship with law enforcement officers." (*Id*. at pp. 1015-1016.) The question is whether " ' "an unacceptable risk [was] presented of impermissible factors coming into play." ' " (*Id*. at p. 1016.) "At the same time, we consider whether the discernible 'degree of prejudice' was justified by other interests, such as the officers' right to attend trial like any other member of the public." (*Ibid*.) "Ultimately, our review must be deferential to the trial court, whose handling of the challenged scene we evaluate only for abuse of discretion." (*Ibid*.)

Here, the trial court acted within its discretion. At the beginning and end of trial, the court instructed the jury against letting bias influence its decision, and both parties reinforced that instruction in closing arguments. The court noted it never saw more uniformed firefighters than civilians in the courtroom, and that observation does not conflict with counsel's statements on the record. And counsel never objected to firefighter presence in the hallways. The court also avoided unnecessary juror exposure to spectators by returning jurors to the jury room during breaks. Even assuming the

6

multiple media requests evidenced a "close and strong relationship" between the community and the firefighters, as defendant argues, we conclude the court properly exercised its discretion to guard against any improper influence or pressure without impairing the firefighters' rights to attend the trial. For these reasons, we conclude the presence of uniformed firefighters at trial was not inherently prejudicial. And because defendant does not contend there was actual prejudice, we reject his fair trial claim. (See *Ramirez, supra*, 10 Cal.5th at p. 1018.)

## II. *Closing Argument*

### A. Additional Background

Defense counsel's closing argument spread across two days and spans 98 pages of the reporter's transcript. We summarize his main points and the comments defendant highlights.

Counsel began by sharing his plan to explain "how and why [defendant was] not guilty." He then described the tough nature of the case with its "significant issues" and a "courtroom full of spectators." After describing the burden of advocating in criminal court as an "incredible burden" placed on the prosecution and the defense, he mentioned the People's burden "to prove stuff beyond a reasonable doubt." He then referred to "people accused [like defendant]" and described an "incredible burden to carry that every day to the courthouse, you know. Like every day this burden of convincing the jury that [defendant] is not guilty," a burden that "the attorneys and the [c]ourt, we live with every day." He also described the burden on firemen who work 24-hour shifts and likened it to the burden on the attorneys and the court in these cases. He explained that this burden is shared with the jury. He then referred to "[t]his burden that we have, the burden that [the prosecution] has to prove the case beyond a reasonable doubt, that burden. The burden of defending [defendant] when he's accused to have killed the fireman. This is something for all of us now." During the remainder of closing argument, counsel referred to the

7

prosecution's burden of proof nine other times and described it in detail and as a "very very high burden."

Throughout his argument, counsel asked the jury to consider defendant's perspective of the incident – it was early in the morning, dark outside, defendant had a history of people trying to break in, and defendant woke to the sound of someone trying to get in. Defendant suffered from macular degeneration, the prosecution offered no evidence about his ability to hear, an audible alarm could not be heard in either of employee's 911 calls, and employee did not know a fire crew was present when she called. Under these circumstances, defendant had no reason to believe there was a fire or fire crew on site, thought his life was in danger, and acted reasonably under the circumstances. Counsel went over the self-defense instruction in detail and argued defendant met its elements. Counsel also specified that he hadn't "talked about any of the law, the murder and the manslaughter, simply because it doesn't apply."

Counsel insisted the prosecution could not prove malice. He reminded the jury that defendant woke up employee and told her to call 911. By doing so, defendant saved employee's life. Counsel argued defendant's selfless behavior did not line up with that of a murderer or one who has an intent to kill. And counsel referred to the warning he yelled before firing, arguing this is not something "malice murderers" do. Defendant's behavior upon being detained was also inconsistent with malice aforethought. Defendant was in shock and remorseful, expressed concern for captain's family, and never admitted to intentionally killing someone. Counsel urged the jury to view defendant as a human who makes mistakes. And he reminded them of defendant's statement that he should have used more forethought as evidence that defendant lacked malice aforethought.

Counsel directed blame to the City of Stockton and the dispatcher. In his view, the city's failures created the conditions surrounding the building that made this incident inevitable. And the dispatcher should have reported a structure fire, which would have

8

produced a higher number of vehicles and firemen at the scene, and should have called employee back to tell her a fire crew was present.

Throughout his argument, counsel made references to Greek mythology, philosophy, music, science, history, art, and literature.

After the court denied defendant's motion for a new trial, defendant made a *Marsden* motion. He made this motion over one year after the jury rendered its verdict. Among other things, he argued: (1) forethought and malice had not been proven; (2) he should have been charged with involuntary manslaughter at most; (3) "in actuality, [he] would have been acquitted"; and (4) counsel's closing arguments were "grossly deficient." The trial court found no grounds to appoint a new attorney.

### B. Concession Regarding Lesser Included Offenses

Defendant contends he was denied his Sixth Amendment right to decide the objective of his defense when counsel conceded that the lesser included offenses did not apply. We disagree.

The Sixth Amendment guarantees criminal defendants the right to assistance of counsel. (*McCoy v. Louisiana* (2018) 584 U.S. 414, 421.) "To gain assistance, a defendant need not surrender control entirely to counsel." (*Ibid*.) "Some decisions . . . are reserved for the client – notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." (*Id*. at p. 422.) "When a client expressly asserts that the objective of 'his defen[s]e' is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt." (*Id*. at p. 423; emphasis omitted.) "The constitutional right recognized in *McCoy* applies in limited circumstances; it is only implicated where defense counsel concedes guilt 'over the defendant's intransigent and unambiguous objection.' " (*In re Maury* (2024) 105 Cal.App.5th 645, 679.)

Here, *McCoy* does not apply because counsel never conceded guilt. While *McCoy* forbids counsel from conceding *guilt* of the charged offense over his client's objection

(see *People v. Bloom* (2022) 12 Cal.5th 1008, 1039), it does not forbid counsel from asserting *innocence* of the charged offense and rejecting the application of lesser included offenses. Even assuming *McCoy* applies, the record shows defendant did not object until after a verdict was rendered. There is no *McCoy* error where a defendant complains about a concession only after trial. (*People v. Palmer* (2020) 49 Cal.App.5th 268, 281-282.) Also, the record does not reflect an intransigent and unambiguous objection to counsel's strategy. In his *Marsden* motion and hearing, defendant generically objected to counsel's closing argument, insisted the prosecution had not proven malice and forethought, and argued defendant should have been charged with involuntary manslaughter at most and "in actuality would have been acquitted." These are not intransigent and unambiguous statements that defendant did not want counsel to reject the lesser included offenses in favor of an acquittal. (See *Palmer*, at p. 282 [defendant muddied the waters of his defense].)[1] For these reasons, defendant does not show *McCoy* error.

Alternatively, defendant argues counsel's statement regarding the lesser included offenses constituted ineffective assistance of counsel. We disagree. To show ineffective assistance, a defendant must prove counsel's performance fell "outside the wide range of professionally competent assistance." (*Strickland v. Washington* (1984) 466 U.S. 668, 690.) Defendant fails to meet that burden. Counsel's decision to "guard against a compromise verdict" and " 'utilize an all-or-nothing' " strategy is a tactical decision. (*People v. Cooper* (1991) 53 Cal.3d 771, 827; *People v. Thomas* (1992) 2 Cal.4th 489, 531 ["Failure to argue an alternative theory is not objectively unreasonable as a matter of law"].) We do not second-guess those decisions " 'in the harsh light of hindsight.' " (*People v. Weaver* (2001) 26 Cal.4th 876, 926.)

---

[1] Because we reach this conclusion, we need not address defendant's contention that he never had an opportunity to raise a timely objection.

10

## C. Other Statements

Defendant contends counsel's closing argument was ineffective for other reasons. Specifically, he contends counsel rambled extensively, backpedaled, confused the facts, refused to argue the elements of murder, and pointed to irrelevant facts, facts not in evidence, and historical references. We conclude counsel's argument was not constitutionally deficient.

Although the right to effective assistance extends to closing arguments, "[r]eversals for ineffective assistance of counsel during closing argument rarely occur." (*People v. Moore* (1988) 201 Cal.App.3d 51, 57.) This is because "[t]he decision of how to argue to the jury after the presentation of evidence is inherently tactical." (*People v. Freeman* (1994) 8 Cal.4th 450, 498.) Closing argument should " 'sharpen and clarify the issues for resolution by the trier of fact,' [citation] but which issues to sharpen and how best to clarify them are questions with many reasonable answers." (*Yarborough v. Gentry* (2003) 540 U.S. 1, 6.) "Judicial review of a defense attorney's summation is therefore highly deferential." (*Ibid*.)

Applying that highly deferential standard here, we conclude the closing argument was within the wide range of reasonable professional assistance. As covered, counsel chose to argue that, consistent with defendant's statements to law enforcement, defendant's actions were justified. Consistent with that decision, counsel presented the evidence in that light, portraying defendant as a sympathetic person who acted reasonably under the circumstances and giving the jury other entities to blame like the city and the dispatcher. Defendant contends counsel's reference to defendant's ability to hear was improper because it was based on a fact not in evidence. But the fact that defendant's hearing ability was not in evidence was precisely counsel's point. In making that point, counsel emphasized the prosecution's burden of proof and attempted to provide a source of reasonable doubt. We also do not agree that counsel erred by referring to defendant's "acts of kindness or empathy." Those acts showed defendant's general regard for human

life, potentially undermining an implied malice element. (*People v. Reyes* (2023) 14 Cal.5th 981, 988 [implied malice requires conscious disregard for human life].) One such act was defendant waking employee. Defendant contends mentioning this act was problematic because counsel ignored defendant's contradictory statements as to when he woke employee. But counsel's point had nothing to do with timing; instead, his point was that defendant acted selflessly by waking employee and saving her life. "The mere fact that the[se] issue[s] could have been argued differently, or with a different emphasis or focus, does not establish ineffective assistance." (*People v. Mincey* (1992) 2 Cal.4th 408, 471.)

Defendant also faults counsel for making numerous historical references and backpedaling some points. These concerns are not persuasive. "Closing argument is as much an art as a science" (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1251), and defendant's concerns fall in the art portion. Counsel tried to build credibility with the jury, in a case involving substantial inculpatory evidence and a sympathetic victim, by admitting issues that were subject to debate and using illustrations from history and literature. (See *ibid.*; *People v. Bramit* (2009) 46 Cal.4th 1221, 1242.) Counsel's effort did not fall below an objective standard of reasonableness.

Lastly, defendant faults counsel for suggesting defendant bore some of the burden of proof. Defendant makes too much of isolated remarks. At the beginning of his closing argument, counsel referred to the "burden of convincing the jury that [defendant] is not guilty," but he did so just after referring to the People's burden of proof beyond a reasonable doubt. And he made this statement while speaking broadly of various burdens – the burden on firemen who work 24-hour shifts, the burden on attorneys and the court in these types of cases, the burden on defendant of coming to court everyday, and the burden on the jury to render a verdict. Counsel then repeatedly referred to the People's burden throughout his argument and described the reasonable doubt standard in detail. Considering the totality of counsel's statements regarding the burden of proof, the court's

instruction on that burden, and the court's instruction that the jury must follow its instructions over contrary attorney comment, we see no prejudice from counsel's isolated statements regarding defendant's burden. (*Strickland, supra*, 466 U.S. at p. 687 [defendant must show deficient performance prejudiced defendant]; *People v. Krebs* (2019) 8 Cal.5th 265, 335 [we presume jurors followed court's instructions].)

       III.  *Jury Instruction on Right to Defend Real or Personal Property*

       A. Additional Background

In his motions in limine, defendant requested the jury instruction on the right to defend real or personal property (CALCRIM No. 3476). The court cited *People v. Ceballos* (1974) 12 Cal.3d 470 as leading it to believe the instruction might be appropriate. The prosecution had no objection, and the court agreed to give it. But the prosecution later changed its position, and the court ultimately agreed with the prosecution, concluding that CALCRIM Nos. 505, 506, and 3477 covered the issues and CALCRIM No. 3476 was "not an appropriate instruction . . . in this case."

       B. Duty to Give CALCRIM No. 3476

Defendant contends the trial court prejudicially erred by refusing to instruct the jury with CALCRIM No. 3476. Specifically, he contends deadly force can be used to defend a dwelling, and the instructions the court gave did not cover that defense. Applying de novo review, we disagree. (*People v. Morales* (2021) 69 Cal.App.5th 978, 990 (*Morales*).)

CALCRIM No. 3467 codifies Civil Code section 50, which allows a property owner to use reasonable force to protect his or her property from imminent harm. But "the intentional use of deadly force merely to protect property is never reasonable." (*People v. Curtis* (1994) 30 Cal.App.4th 1337, 1360.) "The defendant must also show either self-defense or defense of others, i.e., that he or she reasonably believed the intruder intended to kill or inflict serious injury on someone in the home." (*Ibid*.)

13

The law on homicide helps explain this issue. Section 197 provides that homicide is justifiable " '[w]hen committed in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony.' " (*Morales, supra*, 69 Cal.App.5th at p. 991.) *Ceballos* "limited the meaning of 'felony' in [section 197] because . . . many modern felonies do not involve a danger of serious bodily harm." (*Morales,* at p. 991, citing *Ceballos*, 12 Cal.3d at pp. 477-478.) "*Ceballos* therefore read section 197 as permitting the use of deadly force to prevent a felony only if the felony is 'forcible and atrocious.' " (*Morales,* at p. 991, citing *Ceballos*, at p. 478.) According to *Ceballos*, examples of forcible and atrocious crimes are murder, mayhem, and robbery. (*Morales*, at p. 991, citing *Ceballos*, at p. 478.) But *Ceballos* qualified that not all burglaries would trigger the right to use deadly force in self-defense. (*Morales*, at p. 991, citing *Ceballos*, at p. 479.) A robbery "cannot trigger the right to use deadly force in self-defense unless the circumstances of the robbery gave rise to a reasonable belief that the victim would suffer great bodily injury or death." (*Morales*, at p. 992.) "[T]he touchstone for self-defense remains the reasonable belief of the danger of great bodily injury or death, not the threat of a robbery in and of itself." (*Ibid.*)

Here, the trial court instructed the jury that defendant was not guilty of murder if, among other requirements, he reasonably believed he was defending a home from someone who intended or tried to commit a robbery "whose character and manner reasonably created a fear of death or serious bodily harm" or "violently or tumultuously tried to enter that home intending to commit an act of violence against someone inside." This instruction accurately stated the law as applied to the facts. CALCRIM No. 3476 was not applicable.

DISPOSITION

The judgment is affirmed.

/s/
MESIWALA, J.

We concur:

/s/
EARL, P. J.

/s/
MAURO, J.

15